**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SHARRON E. ANGLE; CITIZENS IN
CHARGE; KENNETH R. BLACKMAN;
TONY BADILLO; JACK LIPSMAN; AL
MAURICE; PEST COMMITTEE,
              *Plaintiffs-Appellants,*

v.

ROSS MILLER, Secretary of State,
              *Defendant-Appellee.*

No. 10-16707

D.C. No.
2:09-cv-01969-JCM-
LRL

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted
September 1, 2011—San Francisco, California

Filed March 14, 2012

Before: Raymond C. Fisher and Johnnie B. Rawlinson,
Circuit Judges, and Richard Mills, District Judge.*

Opinion by Judge Fisher

*The Honorable Richard Mills, Senior United States District Judge for
the Central District of Illinois, sitting by designation.

3009

## COUNSEL

Kermitt L. Waters (argued), Las Vegas, Nevada; Don P. Chairez (argued), for the appellants.

Catherine Cortez Masto, Attorney General; K. Kevin Benson (argued), Deputy Attorney General, Carson City, Nevada, for the appellee.

**OPINION**

FISHER, Circuit Judge:

Nevada permits direct legislation through ballot initiatives. To qualify an initiative for the ballot, proponents must obtain signatures from a number of registered voters equal to 10 percent of the votes cast in the previous general election in each of the state's congressional districts. The district court held that this geographic distribution requirement, which requires proponents to collect signatures from each of the state's congressional districts, violates neither the Equal Protection Clause nor the First Amendment. We affirm.

## I. Background

The Nevada Constitution authorizes the citizens of Nevada to enact statutes and amend the Nevada Constitution through the initiative process. *See* Nev. Const. art. 19, § 2. To place an initiative on the ballot, proponents must obtain signatures from a number of registered voters equal to 10 percent of the votes cast in the previous general election. *See id.*

This signature requirement is also subject to a geographic distribution requirement known as the All Districts Rule.[1]

---

[1]The state adopted the All Districts Rule after courts invalidated the state's previous geographic distribution requirements. *See ACLU of Nev. v. Lomax*, 471 F.3d 1010, 1012, 1018-21 (9th Cir. 2006) (striking down Nevada's "13 Counties Rule," adopted in 1958 and requiring initiative proponents to obtain signatures from a number of registered voters equal to 10 percent or more of the number of voters who voted in the last preceding general election in 13 of the state's 17 counties); *Marijuana Policy Project v. Miller*, 578 F. Supp. 2d 1290, 1307-09 (D. Nev. 2008) (striking down the state's "All Counties Rule," requiring initiative proponents to obtain signatures from registered voters equal to at least 10 percent of voters in the last general election in each county of the state). In each case, the court concluded that the geographic distribution requirement violated the Equal Protection Clause by affording sparsely populated counties the

Adopted in 2009, the All Districts Rule requires initiative pro-
ponents to meet the 10 percent signature threshold in each of
the state's congressional districts. *See* Act of June 17, 2011,
ch. 501, 2011 Nev. Laws, § 64 (to be codified at Nev. Rev.
Stat. § 295.012) ("A petition for initiative or referendum that
proposes a constitutional amendment or statewide measure
must be proposed by a number of registered voters from each
petition district in the State that is at least equal to 10 percent
of the voters who voted in that petition district at the last pre-
ceding general election."); Act of June 13, 2011, ch. 320,
2011 Nev. Laws, § 1 (to be codified at Nev. Rev. Stat.
§ 293.069) ("'Petition district' means a district . . . for the
election of Representatives in Congress.").

Nevada had three congressional districts at the time the
state adopted the All Districts Rule and at the time the plain-
tiffs filed this lawsuit. The First and Third Districts were
located within Clark County, which is situated in the south-
east corner of the state and includes Las Vegas. The Second
District included each of the state's other 16 counties, includ-
ing all of northern Nevada, as well as portions of Clark
County not included in the First and Third Districts. Nevada
will have four congressional districts once the 2010 reappor-
tionment and redistricting processes are completed. The
state's congressional districts have equal populations, as the
federal Constitution requires. *See Karcher v. Daggett*, 462
U.S. 725, 730 (1983).

---

same political power as heavily populated counties, thereby diluting the
political power of voters living in the more populous counties. *See Lomax*,
471 F.3d at 1019-20; *Marijuana Policy Project*, 578 F. Supp. 2d at 1308-
09. In each case, the court also suggested that the state could avoid consti-
tutional problems by requiring initiative proponents to obtain signatures
from districts having equal populations. *See Lomax*, 471 F.3d at 1021;
*Marijuana Policy Project*, 578 F. Supp. 2d at 1304, 1309. By adopting the
All Districts Rule, which requires signatures to be gathered from congres-
sional districts having equal populations, Nevada has followed that advice.

This action presents a facial challenge to the All Districts Rule. The plaintiffs are five individuals and two organizations, each of which opposes the All Districts Rule. Second Am. Compl. ¶¶ 17-26. The defendant is Ross Miller, Nevada's Secretary of State, who is sued solely in his official capacity. *Id.* at 1. We refer to the plaintiffs collectively as "plaintiffs" and to the defendant as "the state."

The plaintiffs seek an order declaring the All Districts Rule unconstitutional and enjoining the state from enforcing it. As relevant here, they raise two claims. First, they contend that the All Districts Rule violates the Equal Protection Clause by allowing a minority of the state's population to veto the wishes of the majority with regard to ballot initiatives, making the votes of some citizens more influential than those of others. Second, they contend that the All Districts Rule violates the First Amendment by significantly increasing the burdens and expenses placed upon individuals seeking to quality initiatives for the ballot.

The parties filed cross motions for summary judgment and the district court rejected the plaintiffs' claims in a published opinion. *See Angle v. Miller*, 722 F. Supp. 2d 1206 (D. Nev. 2010).[2] The plaintiffs timely appealed. We have jurisdiction under 28 U.S.C. § 1291, we review de novo, *see City of L.A. v. San Pedro Boat Works*, 635 F.3d 440, 446 (9th Cir. 2011), and we affirm.

## II.  Equal Protection

**[1]** "Voting is a fundamental right subject to equal protection guarantees under the Fourteenth Amendment." *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1076

---

[2]The district court granted summary judgment to the plaintiffs on one issue — their challenge to the circulator affidavit requirements of Nevada Administrative Code section 295.020. *See Angle*, 722 F. Supp. 2d at 1209-10. The state does not appeal that ruling.

(9th Cir. 2003). A state "may decline to grant a right to legislate through ballot initiatives." *Id.* at 1077 n.7. "All procedures used by a State as an integral part of the election process," however, "must pass muster against the charges of discrimination or of abridgment of the right to vote." *Moore v. Ogilvie*, 394 U.S. 814, 818 (1969). Thus, when a state chooses to give its citizens the right to enact laws by initiative, "it subjects itself to the requirements of the Equal Protection Clause." *Idaho Coalition*, 342 F.3d at 1077 n.7.

Here, the plaintiffs argue that the All Districts Rule violates equal protection for three reasons: (1) that it results in vote dilution under the principle of *Moore v. Ogilvie*, 394 U.S. 814 (1969); (2) that it results in vote dilution under a principle articulated in *Gray v. Sanders*, 372 U.S. 368, 381 & n.12 (1963), and *Gordon v. Lance*, 403 U.S. 1, 4-5 (1971); and (3) that it discriminates against an identifiable class of voters. We address their arguments in turn.

## A.

**[2]** "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Consistent with this principle, both the Supreme Court and this court have invalidated geographic distribution requirements that allocate equal political power to geographical units having unequal population.

In *Moore*, 394 U.S. at 815, 818-19, the Supreme Court invalidated an Illinois law requiring presidential candidates seeking a place on the ballot to obtain 200 petition signatures from each of at least 50 of the state's 102 counties. The law violated the principle of one person, one vote because it gave equal political power to "sparsely settled counties and populous counties alike, contrary to the constitutional theme of

equality among citizens in the exercise of their political rights." *Id.* at 818-19.

We extended *Moore* to ballot initiatives in *Idaho Coalition*, which invalidated an Idaho law requiring initiative proponents to obtain signatures from 6 percent of qualified voters in each of at least half of Idaho's 44 counties to qualify an initiative for the ballot. *See* 342 F.3d at 1074-75. Relying on *Moore*, we held that the geographic distribution requirement triggered strict scrutiny because it "allocate[d] equal power to counties of unequal population." *Id.* at 1078. "[T]he few voters in a sparsely populated county have a power equal to the vastly larger number of voters who reside in a populous county." *Id.* We rejected the state's argument that it had a "compelling interest in requiring a modicum of statewide support" for proposed ballot measures. *Id.* Furthermore, even if ensuring statewide support was a compelling interest, the requirement was not narrowly tailored because the state "could achieve the same end through a geographic distribution requirement" based on districts of equal population. *Id.* at 1078, 1079.

We relied on both *Moore* and *Idaho Coalition* in *ACLU of Nevada v. Lomax*, 471 F.3d 1010 (9th Cir. 2006), where we invalidated Nevada's former geographic distribution requirement, known as the 13 Counties Rule. That rule required initiative proponents to gather signatures of a number of registered voters equal to 10 percent or more of the number of voters who voted at the last preceding general election in 13 of Nevada's 17 counties. *See* Nev. Const. art. 19, § 2. Citing *Idaho Coalition*, we held that "an initiative qualification rule that requires a fixed percentage of petition signatures from a fixed percentage of counties in a state with a substantially uneven geographic distribution pattern, which favors residents of sparsely populated areas over residents of densely populated areas, violates the Equal Protection Clause." *Lomax*, 471 F.3d at 1020. We applied strict scrutiny because the rule "dilute[d] the power of some votes by providing more sparsely populated counties with the same total power as

densely populated counties." *Id.* As in *Idaho Coalition*, we held that the state lacked a compelling interest in ensuring a modicum of statewide support for initiatives. *See id.* at 1021 & n.13. Furthermore, even if this was a compelling interest, the 13 Counties Rule was not narrowly tailored because the state could have ensured statewide support by requiring initiative proponents to obtain signatures from districts, such as state legislative districts, having equal population. *See id.* at 1021.

**[3]** In sum, our case law establishes that geographic distribution requirements assigning equal political power to districts of unequal population violate equal protection. The All Districts Rule, however, avoids that defect. Whereas the rules in *Moore*, *Idaho Coalition* and *Lomax* afforded equal political power to counties having unequal populations, the All Districts Rule grants equal political power to congressional districts having *equal* populations. It thus does not trigger strict scrutiny under the principle announced in *Moore*, and it survives rational basis review because it serves the state's legitimate interest in ensuring a minimum of statewide support for an initiative as a prerequisite to placement on the ballot.

## B.

The plaintiffs argue that this is not the end of the inquiry because "there is more than one way for a state's election district scheme to create vote dilution." Reply Brief of Appellants 5. They rely on another set of Supreme Court cases suggesting that, with respect to a statewide election, equal protection requires votes to be counted on a statewide, rather than a district-by-district, basis.

This line of authorities begins with *Gray v. Sanders*, 372 U.S. 368 (1963), which invalidated the way Georgia nominated candidates for statewide office. The state allocated a number of "units" to each county, much like the Electoral College assigns electoral votes to the states. The county unit

system was based partially on population, but gave sparsely populated counties a disproportionate number of units relative to their populations. *See Gray*, 372 U.S. at 371-73. The Supreme Court invalidated the system under the principle later expanded upon in *Moore*. The scheme violated equal protection because it "[gave] every qualified voter one vote in a statewide election; but in counting those votes . . . employ-[ed] the county unit system which in end result weight[ed] the rural vote more heavily than the urban vote and weight[ed] some small rural counties heavier than other larger rural counties." *Id.* at 379. As relevant here, the Court also said that the unit system would have violated equal protection "even if unit votes [had been] allocated strictly in proportion to population" — that is, even if the system did not give disproportionate weight to small, rural counties. *Id.* at 381 n.12. The Court explained that, "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote — . . . wherever their home may be in that geographical unit." *Id.* at 379.

**[4]** The Court expanded on this principle in *Gordon v. Lance*, 403 U.S. 1 (1971):

> [I]n *Gray*, we held that *the county-unit system would have been defective even if unit votes were allocated strictly in proportion to population*. We noted that if a candidate received 60% of the votes cast in a particular county he would receive that county's entire unit vote, the 40% cast for the other candidates being discarded. The defect, however, continued to be geographic discrimination. Votes for the losing candidates were discarded solely because of the county where the votes were cast. Indeed, votes for the winning candidate in a county were likewise devalued, because all marginal votes for him would be discarded and would have no impact on the statewide total.

403 U.S. at 4-5 (emphasis added) (citation omitted). Taken together, *Gray* and *Gordon* suggest that, with respect to a statewide election, a state must count votes on a statewide, rather than a district-by-district, basis. Doing otherwise devalues votes based on where voters happen to live. As the Court said in *Reynolds*, 377 U.S. at 560, "*Gray* . . . held that voters cannot be classified, constitutionally, on the basis of where they live, at least with respect to voting in statewide elections."[3]

**[5]** Thus, were a state to decide an election for governor by determining which candidate received a majority of the votes cast in a majority of districts, rather than determining which candidate received a majority of the votes cast statewide, it might impermissibly devalue votes according to *Gray* and *Gordon*. The result presumably would be the same if a state were to decide an election on a statewide ballot measure by determining whether the initiative received majority support in a majority of districts, rather than whether the initiative received a majority of votes statewide. We must decide whether this principle disfavoring geographic counting also extends to the signature phase of a ballot initiative.

Similar to the two examples above, the All Districts Rule counts petition signatures on a geographic rather than a statewide basis. As a result, a ballot initiative may obtain the total number of signatures required statewide, but fail to qualify for the ballot solely based on where signers live. The All Districts Rule thus implicates the concerns raised in *Gray*, *Gordon* and *Reynolds* that "voters cannot be classified . . . on the basis of where they live, at least with respect to voting in statewide elections." *Id.*

**[6]** We do not believe, however, that the All Districts Rule violates equal protection on this basis. Although language in

---

[3]Although *Gray*, *Gordon* and *Reynolds* all suggest that counting votes on a district basis for a statewide election would violate equal protection, none of those cases was decided on that basis.

*Gray*, *Gordon* and *Reynolds* suggests that a district-by-district system of counting *votes* in a statewide election would violate equal protection, none of the decisions suggests that district-by-district counting of *signatures* obtained to qualify an initiative for the ballot presents the same problem. Votes and petition signatures are similar in some respects, *see Idaho Coalition*, 342 F.3d at 1076 (noting that, as a general matter, "equal protection guarantees . . . apply to ballot access restrictions just as they do to elections themselves"), but ballot access requirements and elections serve different purposes. A ballot access requirement determines whether there is a minimum level of grassroots support for an initiative to warrant its inclusion on the ballot. An election, by contrast, measures the collective, aggregate will of the electorate. These differences suggest that the bar on district-by-district counting apparently embodied in *Gray*, *Gordon* and *Reynolds* does not apply to the counting of petition signatures to qualify initiatives for the ballot.

**[7]** This inference is supported by experience. Although geographic distribution requirements are commonplace at the ballot access stage, we are not aware of any judicial decision invalidating them for this reason.[4] Our own cases, in fact, have presumed that geographic distribution requirements are permissible for signature collection, so long as they involve districts with equal populations. *See Idaho Coalition*, 342 F.3d at 1079; *see also Lomax*, 471 F.3d at 1021. In addition, it appears that courts that have addressed the issue have uniformly upheld geographic distribution requirements for signature collection when they have been based on equipopulous districts. *See Libertarian Party of Va. v. Davis*, 766 F.2d 865, 868 (4th Cir. 1985) (upholding a Virginia law requiring minor-party presidential candidates to submit signatures from

---

[4]In *Moore*, the constitutional defect was the allocation of equal political power to counties with unequal population. *See* 394 U.S. at 818-19. The Court did not suggest that requiring signatures to be distributed geographically was itself impermissible.

200 voters in each of the state's 10 congressional districts to gain a place on the ballot, because congressional districts, unlike county lines, are "apportioned in such a way as to contain, as nearly as practicable, an equal number of inhabitants"), *abrogation on other grounds recognized by Lux v. Judd*, 651 F.3d 396, 404 (4th Cir. 2011); *Libertarian Party v. Bond*, 764 F.2d 538, 543-44 (8th Cir. 1985) (upholding a Missouri law requiring new political parties to submit signatures from registered voters in at least one half of the state's nine congressional districts as a prerequisite to getting on the ballot, because "Missouri congressional districts are virtually equal in population," and "no class of voters is discriminated against in any manner"); *Udall v. Bowen*, 419 F. Supp. 746, 747, 749 (S.D. Ind. 1976) (upholding an Indiana law requiring presidential candidates to submit 500 signatures from each of the state's 11 congressional districts to be placed on the presidential preference primary ballot, because "the eleven congressional districts in Indiana are substantially equal in population"). Thus, whatever limits *Gray*, *Gordon* and *Reynolds* may place on counting *votes* for a statewide initiative, we hold that they do not prohibit a state from requiring petition *signatures* to be distributed among districts of equal population.

## C.

The plaintiffs also argue that the All Districts Rule denies equal protection because it violates the principle of majority rule, allowing "a small minority of the population of the state to veto the overwhelming wishes of the majority with regard to a particular ballot initiative." Brief of Appellants 13.

**[8]** "[M]ajority rule" is one of the "ideals" that drives our democracy. *Reynolds*, 377 U.S. at 566. "[T]here is nothing in the language of the Constitution," however, "that requires that a majority always prevail on every issue." *Gordon*, 403 U.S. at 6. As the Supreme Court explained in *Gordon*, where it upheld a West Virginia law prohibiting political subdivisions

from incurring bonded indebtedness or increasing tax rates without the approval of 60 percent of the voters in a referendum election, *see id.* at 2, "any departure from strict majority rule gives disproportionate power to the minority," but "so long as such provisions do not discriminate against or authorize discrimination against any identifiable class they do not violate the Equal Protection Clause," *id.* at 6-7. Thus, "[t]o the extent that [Nevada] wishes to create a check on the will of the majority by a *non* discriminatory means, the equal protection clause is no bar." *Idaho Coalition*, 342 F.3d at 1079.

[9] Here, we can discern no identifiable class that is discriminated against by the All Districts Rule. It "singles out no 'discrete or insular minority' for special treatment." *Gordon*, 403 U.S. at 5. It also applies to all initiatives regardless of subject matter, not solely to initiatives thought to be favored by a targeted segment of the population. *See id.*

The plaintiffs suggest that the All Districts Rule discriminates against urban voters because it gives voters in the relatively rural Second District the ability to veto initiatives supported by voters in the more urban First and Third Districts. Brief of Appellants 19; Badillo Aff. ¶¶ 12, 17. The plaintiffs offer no evidence in support of this assertion, however. In any event, voters in the First and Third districts are not a discrete or insular minority. Nor do voters in the Second District have a "strangle hold on the State Legislature," *Reynolds*, 377 U.S. at 570, that would prevent the majority of voters in the First and Third Districts from persuading the legislature to modify the All Districts Rule if it interferes with their political preferences. The rule thus does not discriminate against an identifiable class.

### III.  First Amendment

[10] Under the First Amendment, election "[r]egulations imposing *severe burdens* on plaintiffs' rights must be narrowly tailored and advance a compelling state interest." *Prete*

*v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006) (quoting *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1007 (9th Cir. 2003)). "*Lesser burdens* . . . trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (quoting *Ariz. Right to Life*, 320 F.3d at 1007-08). In applying this standard, we bear in mind that "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley v. Am. Constitutional Law Found., Inc.* (*ACLF*), 525 U.S. 182, 191 (1999). At the same time, we must "separate valid ballot-access provisions from invalid interactive speech restrictions," thus "guard[ing] against undue hindrances to political conversations and the exchange of ideas." *Id.* at 192. Applying this framework here, we first address whether the plaintiffs have shown that the All Districts Rule imposes a severe burden on First Amendment rights and then address whether the state has articulated a sufficient interest to sustain the rule.

## A. Severe Burden

The Supreme Court has identified at least two ways in which restrictions on the initiative process can severely burden "core political speech." *Meyer v. Grant*, 486 U.S. 414, 422 (1988). First, regulations can restrict one-on-one communication between petition circulators and voters. *See id.* at 422-23. Second, regulations can make it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot, "thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 423. We consider each of these types of burdens as applied to the All Districts Rule.

### 1. One-on-one Communication Between Circulators and Voters

**[11]** Unlike the restrictions on petition circulators at issue in *Meyer* and *ACLF*, the All Districts Rule does not restrict

one-on-one communication between petition circulators and voters. It neither "limit[s] the number of voices who will convey the initiative proponents' message," *ACLF*, 525 U.S. at 194-95 (quoting *Meyer*, 486 U.S. at 422) (alterations and internal quotation marks omitted), nor "discourages participation in the petition circulation process," *id.* at 200. On the contrary, in terms of interactive communication between circulators and voters, the All Districts Rule likely *increases* the "total quantum of speech" on public issues, by requiring initiative proponents to carry their messages to voters in different parts of the state. *Meyer*, 486 U.S. at 423. The rule thus does not impose a severe burden on communication between circulators and voters.

## 2.   Limiting the Ability to Make an Initiative a Matter of Statewide Discussion

The plaintiffs nonetheless contend that the All Districts Rule imposes a severe burden on core political speech because it makes it more difficult and expensive to qualify an initiative for the ballot. There is no First Amendment right to place an initiative on the ballot. *See Meyer*, 486 U.S. at 424 (recognizing that "the power of the initiative is a state-created right"). Regulations that make it more difficult to qualify an initiative for the ballot therefore do not necessarily place a direct burden on First Amendment rights.

Such regulations, however, may indirectly impact core political speech. As *Meyer* recognized, when an initiative fails to qualify for the ballot, it does not become "the focus of statewide discussion." *Meyer*, 486 U.S. at 423. Ballot access restrictions may therefore "reduc[e] the total quantum of speech on a public issue." *Id.*[5] Thus, as applied to the initia-

---

[5]The state's power to ban initiatives thus does not include the lesser power to restrict them in ways that unduly hinder political speech. *See Meyer*, 486 U.S. at 424-25 (rejecting the contention "that because the power of the initiative is a state-created right, [a state] is free to impose limitations on the exercise of that right," because "the power to ban initiatives entirely" does not include "the power to limit discussion of political issues raised in initiative petitions").

tive process, we assume that ballot access restrictions place a severe burden on core political speech, and trigger strict scrutiny, when they significantly inhibit the ability of initiative proponents to place initiatives on the ballot.

This is similar to the standard we apply to ballot access restrictions regulating candidates. In that setting, we have held that "the burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008) (quoting *Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 762 (9th Cir. 1994)); *see also PEST Comm. v. Miller*, 626 F.3d 1097, 1107, 1110 (9th Cir. 2010) (looking to the *Nader* standard for guidance in evaluating regulation of the initiative process).

To establish that the All Districts Rule significantly inhibits the ability of proponents to place initiatives on the Nevada ballot, the plaintiffs rely on affidavits submitted by Tony Badillo, a plaintiff, and Janine Hansen. Badillo is a supporter of a proposed initiative that would prevent the Las Vegas casinos from taking tips received by dealers. His affidavit declares:

> With all of our volunteers living in the two congressional districts of Southern Nevada and with all of our volunteers unable to travel in their spare time to the Northern part of the state, we are injured by the requirement of being forced to collect signatures in all of the districts of the state. As the abuses by the casinos are only taking part in Las Vegas, it is impossible to recruit volunteers in the northern part of Nevada.

Badillo Aff. ¶ 16. Hansen's affidavit says that she has been involved in several efforts to gather petition signatures in

northern Nevada over the past decade. She asserts that it would be difficult to satisfy the All Districts Rule:

> The bureaucratic public officials in Northern Nevada are hostile to initiative petitions and they are hostile to allowing citizens to attempt to gather signatures in a public forum. As the Northern Nevada leader for several efforts to gather signatures, I have gathered signatures in every county of Nevada. Congressional District Two is very hostile to initiative petitions and it is much more expensive to gather signatures in these rural counties. Volunteers are more afraid to travel to these small counties. . . .
>
> Based upon my experience in Congressional District Two this past decade in gathering signatures, I believe that the public officials who should be in charge of protecting our right to petition the government will make it very difficult for signature gatherers to gather signatures at any public venue. . . .
>
> My volunteers and I are afraid and chilled to exercise our First Amendment rights to gather signatures for initiative petitions.

Hansen Aff. ¶¶ 13, 19, 27.

[12] Badillo's and Hansen's assertions are too vague, conclusory and speculative to create a triable issue that the All Districts Rule significantly reduces the chances that proponents will be able to gather enough signatures to place initiatives on the ballot.[6] Badillo's affidavit does not explain, for

---

[6]"Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (adopting district court order); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create

example, why volunteers would be unable to travel in their spare time to the northern part of Nevada, what efforts have been made to recruit volunteers in the northern part of the state, why the use of volunteer, rather than paid, petition circulators is the only alternative or why signatures cannot be obtained from voters residing in the portion of the second congressional district located within Clark County. The plaintiffs have presented only speculation, without supporting evidence, that the All Districts Rule imposes a severe burden on the First Amendment rights of initiative proponents. They have not presented any evidence that, despite reasonably diligent efforts, they and other initiative proponents have been unable to qualify initiatives for the ballot as a result of the geographic distribution requirement imposed by the All Districts Rule. On this record, no severe burden has been shown. Strict scrutiny therefore does not apply.

## B.  Important Regulatory Interest

[13] Because the plaintiffs have not shown that the All Districts Rule imposes severe burdens, the state need show only that the rule furthers "an important regulatory interest." *Prete*, 438 F.3d at 969. The state contends that it has satisfied this burden because the All Districts Rule "promotes the State's important regulatory interests in requiring a modicum of state-wide support for initiatives that seek to change state-wide law, or to modify the Nevada Constitution," and "prevents voter confusion and inefficiency by preventing the ballot from being cluttered with items of primarily local interest, but which would have state-wide impact." Defendant-Appellee's Answering Brief 28.

a factual dispute for purposes of summary judgment."); *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) (per curiam) ("When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact.").

**[14]** Nevada undeniably has an important regulatory interest "in making sure that an initiative has sufficient grass roots support to be placed on the ballot." *Meyer*, 486 U.S. at 425-26. The Supreme Court has recognized this interest as "substantial." *ACLF*, 525 U.S. at 204. The issue here is whether a state can assert an important interest in ensuring that this grassroots support be distributed throughout the state. Neither the Supreme Court nor this court has addressed this precise question.[7]

**[15]** We are persuaded that the state has shown an important regulatory interest. The First Amendment permits states "considerable leeway" in regulating the electoral process, provided their choices do not produce "undue hindrances to political conversations and the exchange of ideas." *ACLF*, 525 U.S. at 191-92. We believe this leeway applies to a state's decision about how to measure the grassroots support sufficient to qualify an initiative for the ballot. Some states may prefer a single, statewide signature requirement, while others may choose a signature requirement with a geographic component, restricting the initiative to proposals having a minimum level of statewide support, rather than only localized support. Half of the states with initiatives currently impose a geographic distribution requirement on petition signatures, reflecting the view that "geographic distribution requirements . . . are important because they force initiative proponents to demonstrate that their proposal has support statewide, not just

---

[7]Ensuring a modicum of statewide support for an initiative is not a *compelling* state interest. *See Moore*, 394 U.S. at 818 (holding that the state's asserted interest in ensuring "statewide support for launching a new political party rather than support from a few localities" was "no answer" to the equal protection problems presented by the Illinois law requiring independent presidential candidates to obtain signatures from voters in a number of counties); *Lomax*, 471 F.3d at 1021 & n.13 (rejecting the state's contention that it had a compelling governmental interest in ensuring a modicum of statewide support for proposed initiatives); *Idaho Coalition*, 342 F.3d at 1078 (same). Neither the Supreme Court nor this court, however, has addressed whether a state's interest in ensuring statewide support for an initiative satisfies the lesser "important regulatory interest" standard.

among the citizens of the state's most populous region." *Initiative Petition Signature Requirements*, National Conference of State Legislatures (Apr. 7, 2010), *available at* http://www.ncsl.org/legislatures-elections/elections-campaigns/signature-requirements.aspx; *see also* Thomas E. Cronin, *Direct Democracy* 236 (1989) ("Geographic requirements make sense in states such as New York, Texas, or Hawaii. Surely a petition in New York should include some signatures from localities outside New York City; a petition in Texas should have at least some support in the various regions of that sprawling state; and some percentage of petitions should come from some of the outer islands should Hawaii adopt the initiative and referendum."). Nevada has therefore articulated an important regulatory interest sufficient to justify the All Districts Rule.

## IV.   Conclusion

The plaintiffs have not demonstrated the existence of a genuine issue on their claims that the All Districts Rule violates either the Equal Protection Clause or the First Amendment. The judgment of the district court is therefore affirmed.

**AFFIRMED.**