**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NATHAN PIERCE; MONTANA
COALITION FOR RIGHTS;
MONTANANS FOR CITIZEN VOTING;
SHERRI FERRELL; LIBERTY
INITIATIVE FUND,
          *Plaintiffs-Appellants*,

v.

CHRISTI JACOBSEN, in her official
capacity as the Secretary of State for
the State of Montana; AUSTIN
KNUDSEN, in his official capacity as
the Attorney General of the State of
Montana; JEFF MANGAN, in his
official capacity as the
Commissioner of the Montana
Commission on Political Practices,
          *Defendants-Appellees.*

No. 21-35173

D.C. No.
6:18-cv-00063-
CCL

OPINION

Appeal from the United States District Court
for the District of Montana
Charles C. Lovell, District Judge, Presiding

Argued and Submitted February 9, 2022
Portland, Oregon

Filed August 10, 2022

Before:  Richard A. Paez and Jacqueline H. Nguyen, Circuit Judges, and John R. Tunheim,* District Judge.

Opinion by Judge Tunheim

---

## SUMMARY**

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment for defendants in an action brought pursuant to 42 U.S.C. § 1983 challenging Montana's initiative petitioning process, which requires that signature gatherers seeking to gather sufficient signatures to place a measure before voters on a ballot must be Montana residents and may not be paid based upon the number of signatures obtained.  Mont. Code Ann. § 13-27-102(2) (2021).

Plaintiffs—a collection of organizations and individuals interested in petitioning in Montana—alleged that both of these restrictions violated their speech and association rights under the First Amendment.  In upholding both restrictions, the district court held that strict scrutiny did not apply because plaintiffs failed to demonstrate that either restriction imposed a severe burden on their rights.  It went on to find

---

* The Honorable John R. Tunheim, United States District Judge for the District of Minnesota, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

that both restrictions sufficiently furthered Montana's important regulatory interest to survive less exacting review.

The panel reversed the district court's holding with regards to the residency requirement because it (1) imposed a severe burden on the exercise of First Amendment rights and therefore was subject to strict scrutiny; and (2) was not narrowly tailored to further Montana's compelling interest. The panel noted that just as in *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008), the restriction at issue here entirely precluded out-of-state residents from exercising a form of core political speech, reduced the pool of available circulators, and imposed a severe burden. Although the state had a compelling interest in preventing fraud, it had failed to demonstrate that this ban was narrowly tailored to serve this interest when other, narrower options were available. The panel therefore reversed the judgment of the district court and remanded with instructions to enter partial summary judgment in favor of plaintiffs on this issue.

The panel affirmed the district court's holding with regards to the pay-per-signature restriction because it concluded that (1) on the basis of the record produced here, plaintiffs had not demonstrated that the pay-per-signature ban imposed a severe burden on First Amendment rights and therefore less exacting review applied; and (2) the state had established that an important regulatory interest was furthered by this restriction. The panel noted that the pay-per-signature restriction did not categorically limit the pool of circulators, did not impose a complete prohibition on any form of payment, and rationally reduced the incentive to forge signatures and commit fraud.

## COUNSEL

Paul A. Rossi (argued), IMPG Advocates, Mountville, Pennsylvania, for Plaintiffs-Appellants.

Christian Corrigan (argued), Associate Solicitor; Hannah E. Tokerud, and Patrick M. Risken, Assistant Attorneys General; Austin Knudsen, Attorney General; Office of the Attorney General, Helena, Montana; for Defendants-Appellees.

## OPINION

TUNHEIM, District Judge:

The Montana State Constitution gives Montanans the power to enact laws, amend the constitution, and call a constitutional convention through an initiative petition process. The process requires gathering sufficient signatures on petitions in order to place a measure before voters on the ballot. Montana law, however, limits signature gathering to Montana residents and bars paying signature gatherers based upon the number of signatures obtained.

Plaintiffs—a collection of organizations and individuals interested in petitioning in Montana—allege that both of these restrictions violate their speech and association rights under the First Amendment. The district court granted summary judgment to Defendants, upholding both restrictions. It held that strict scrutiny did not apply because Plaintiffs failed to demonstrate either restriction imposed a severe burden on their rights. It went on to find that both restrictions sufficiently furthered Montana's important regulatory interest to survive less exacting review.

We reverse the district court's holding with regards to the residency requirement because it (1) imposes a severe burden on the exercise of First Amendment rights and (2) is not narrowly tailored to further Montana's compelling interest. We affirm the district court's holding with regards to the pay-per-signature restriction because we conclude that (1) on the basis of the record produced here, Plaintiffs have not demonstrated that the pay-per-signature ban imposes a severe burden on First Amendment rights and (2) the state has established that an important regulatory interest is furthered by this restriction.

## I. Background

Montanans may enact laws, amend the Montana Constitution, and call for a state constitutional convention through an initiative process that culminates in a statewide vote on whether to approve the proposal. Mont. Const. art. III, § 4; *id.* art. XIV, §§ 2, 9. To qualify an initiative for the ballot, an initiative's proponent must gather sufficient valid signatures from Montana voters, among other steps. *Id.* art. III, § 4; *id.* art. XIV, §§ 2, 9. After the election is held with the initiative on the ballot, "[t]he sufficiency of the initiative petition shall not be questioned." *Id.* art. III, § 4, cl. 3.

In 2006, state officials found that the signature gathering process for three initiatives "was permeated by a pervasive and general pattern and practice of fraud." *Montanans for Justice v. Montana ex rel. McGrath*, 146 P.3d 759, 770 (Mont. 2006). The proponents of the 2006 initiatives relied primarily on out-of-state signature gatherers paid on a per-signature basis. *Id.* at 764. These signature gatherers routinely and falsely attested to personally gathering signatures that they did not in fact personally gather, provided false addresses on affidavits, and employed deceitful "bait and switch" tactics to induce Montana voters

to unknowingly sign petitions for multiple initiatives. *Id.* at 770. The initiatives were disqualified from the ballot to protect the viability and integrity of the initiative process. *Id.* at 777–78.

In 2007, the Montana legislature amended the initiative petitioning process to require that signature gatherers (1) must be Montana residents and (2) "may not be paid anything of value based upon the number of signatures gathered." Mont. Code Ann. § 13-27-102(2) (2021). These requirements do not apply to signature gatherers for candidates for office. *See id*; *see also id.* §§ 13-10-201, 203(2). In the seven election cycles since these requirements have been in effect, fourteen initiatives have qualified for the ballot.

In 2018, plaintiffs Montanans for Citizen Voting ("MCV") and Montana Coalition for Rights ("MCR") began the process of qualifying initiatives for placement on the ballot. MCV solicited bids from petition circulation firms to gather the required signatures. It received a bid from Advanced Micro Targeting ("AMT")—a firm with experience in Montana—for $500,000. AMT noted that it does not pay by the signature because it encourages fraud. It also received a bid from Silver Bullet for $469,000. Silver Bullet's bid noted that if the residency requirement and pay-per-signature restriction were eliminated, the estimated cost would be $1 less per signature—about $80,000 less in total. MCV and MCR claim they determined that using out-of-state gatherers and paying by the signature would increase the likelihood of gathering sufficient signatures, increase efficiency, and decrease the cost of the petition drive. They did not attempt to gather signatures for the 2018 or 2020 election cycles.

MCV and MCR, joined by plaintiffs Nathan Pierce, Liberty Initiative Fund, and Sherri Ferrell[1] (collectively, "Plaintiffs"), brought this action in federal district court against the Montana Secretary of State, the Montana Attorney General, and the Commissioner of the Montana Commission on Political Practices (collectively, "Montana") alleging the restrictions violated the First Amendment. Plaintiffs sought declaratory and injunctive relief.[2] The parties filed cross motions for summary judgment.

The district court granted summary judgment to Montana and denied it to Plaintiffs. The court found that Plaintiffs offered only conclusory speculation about the burden the restrictions created, noting that they did not try to gain ballot access and so were unable to adequately demonstrate whether the restrictions limited the number of voices available or whether a reasonably diligent campaign would have been able to secure ballot access. Therefore, the court concluded that the restrictions did not impose a severe burden on speech and that less exacting review—not strict scrutiny—applied. Applying less exacting review, the court upheld both restrictions, finding that any burdens imposed on Plaintiffs' rights were justified by the state's interests in protecting the integrity of the initiative process and preventing fraud. Plaintiffs filed a motion to amend or alter

---

[1] Pierce is a Montana resident and a member of MCR with experience seeking to qualify initiatives for the ballot in Montana. The Liberty Initiative Fund is a national organization that supports state initiative campaigns. Ferrell is a resident of Florida and a professional petition circulator who works in many states.

[2] Plaintiffs initially sought a temporary restraining order or a preliminary injunction but withdrew their motions for preliminary relief.

the judgment, but the court denied the motion. Plaintiffs timely appealed.

On appeal, Plaintiffs argue the district court should have applied strict scrutiny to both restrictions because each severely burdens free speech rights, and that under strict scrutiny, neither restriction is narrowly tailored to further a compelling state interest.

## II. Standard of Review and Jurisdiction

We review de novo the district court's grant of summary judgment. *Courthouse News Serv. v. Planet*, 947 F.3d 581, 589 (9th Cir. 2020). In a First Amendment case, we independently review factual findings. *Id.* We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III. Discussion

The First Amendment, as made applicable to the states by the Fourteenth Amendment, prohibits states from enacting laws "abridging the freedom of speech." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 336 & n.1 (1995). Although there is no constitutional right to enact state laws or constitutional amendments through an initiative process, if a state allows for initiatives through a petitioning process, the gathering of signatures and circulating of initiative petitions are protected by the First Amendment. *Meyer v. Grant*, 486 U.S. 414, 424–25 (1988). The solicitation of signatures on an initiative petition is "core political speech" involving "interactive communication concerning political change." *Id.* at 422.

The First Amendment does not, however, bar all restrictions on circulating petitions, and states have "considerable leeway to protect the integrity and reliability

of the initiative process, as they have with respect to election processes generally." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 191 (1999). Indeed, "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).

When an election law is challenged, the severity of the burden the law imposes on the exercise of constitutional rights is weighed against the strength of the state interests the law serves. *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358 (internal quotation marks and citation omitted). There is no bright-line test to distinguish between valid and invalid restrictions on petition circulation; instead, we must weigh the facts and make our own "hard judgments." *Prete v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006) (quoting *Buckley*, 525 U.S. at 192). The party challenging the law bears the initial burden of making a factual showing of the specific burden caused by the law. *Mont. Green Party v. Jacobsen*, 17 F.4th 919, 925 (9th Cir. 2021); *Ariz. Green Party v. Reagan*, 838 F.3d 983, 989 (9th Cir. 2016).

In *Meyer v. Grant*, the Supreme Court identified two non-exhaustive considerations that aid in determining whether a regulation of the initiative process imposes such a severe burden on core political speech that it triggers strict scrutiny. *See Angle v. Miller*, 673 F.3d 1122, 1132 (9th Cir. 2012) (citing *Meyer*, 486 U.S. at 422–23). The first

consideration is the extent to which a restriction limits the number of voices carrying the initiative proponent's message and the size of the audience the proponent can reach. *Meyer*, 486 U.S. at 422–23. The second consideration is the extent to which a restriction makes it less likely a proponent will get enough signatures to place the issue on the ballot, thereby limiting the ability to make the issue "the focus of statewide discussion." *Id.* at 423. We assume that a restriction is a severe burden when it "significantly inhibit[s] the ability of initiative proponents to place initiatives on the ballot." *Angle*, 673 F.3d at 1133. As we have recognized, this is similar to the standard applied to candidate ballot access restrictions where we consider whether "in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so." *Id.* (quoting *Nader*, 531 F.3d at 1035).

## A.  Residency Requirement

The first restriction at issue is the requirement that initiative petition signature gatherers be residents of Montana. Mont. Code Ann. § 13-27-102(2)(a).

### 1.  Severe or Lesser Burden

Plaintiffs argue that the residency requirement imposes a severe burden on speech because it necessarily reduces the pool of available gatherers and completely bars all non-Montanans from engaging in this form of core political speech. They further argue it imposes a severe burden by limiting the number of professional circulator firms available for hire and driving up the cost of gathering signatures.

The residency requirement fully excludes all persons who support a particular initiative but are not Montana residents from engaging in petition circulation—a form of core political speech. While Montanans can still act as circulators, the requirement necessarily reduces the number of circulators available to carry initiative proponents' messages, thereby limiting the size of the audience an initiative proponent can reach. *See Buckley*, 525 U.S. at 194–95; *Nader*, 531 F.3d at 1035. It also limits the associational rights of Montanans, who cannot associate with non-resident signature gatherers. Because of the total number people barred from gathering signatures—the vast majority of individuals in this country—"it is scarcely debatable" that the pool of circulators and the audience reached is diminished by the residency requirement. *Buckley*, 525 U.S. at 194–95.

The extent to which the residency requirement makes it less likely that reasonably diligent initiative proponents can gain ballot access in light of the entire regulatory scheme is a closer question.[3] Plaintiffs provide little beyond their own bare speculation and speculation offered by their consultants and supporters. Moreover, fourteen initiatives have

---

[3] We note that the district court here seemingly required the challengers themselves to act with reasonable diligence to provide evidence that their efforts to gain ballot access were frustrated. The question, however, is not whether the challengers or even any other proponents have been reasonably diligent but rather the severity of the burden on a hypothetical reasonably diligent initiative proponent. To hold otherwise would preclude using the second *Meyer* consideration as a basis for pre-enforcement review. Of course, a challenger's or others' past efforts will be helpful in analyzing the question of reasonable diligence. *See Storer v. Brown*, 415 U.S. 724, 742 ("Past experience will be a helpful, if not always an unerring, guide . . . ."). The lack of past efforts, however, is not dispositive when evaluating this question.

qualified for the ballot since the residency requirement went into effect. Ultimately, there is little evidence in the record showing that the residency requirement makes it less likely that initiative proponents will successfully gain ballot access.

*Meyer*, however, did not create a two-part test, but rather identified certain considerations to help guide our review. Therefore, Plaintiffs' lack of evidence on the second *Meyer* consideration is not dispositive of the severity of the burden—at least under the circumstances here. Instead, we must weigh all the effects of the regulation to determine whether, on the whole, it severely burdens core political speech. Plaintiffs have shown that the residency requirement imposes an outright ban on a form of core political speech for all non-residents and necessarily diminishes the pool of circulators.[4] We thus hold that the residency requirement here imposes a severe burden on the First Amendment rights of both out-of-state residents and in-state proponents and is therefore subject to strict scrutiny.

This conclusion is in line with our holding in *Nader*. There, we determined that an Arizona residency requirement for candidate petition circulators imposed a severe burden on First Amendment rights. *Nader*, 531 F.3d at 1036. We explained that our conclusion was "mandated" by the Supreme Court's holding in *Buckley* that "significantly

---

[4] In addition to the considerations named in *Meyer*, the residency requirement may also limit the type of voices available. An initiative's proponents cannot use out-of-state circulators who may be able to testify to the impact in their states if their states have enacted similar laws. This limits the type of people with whom Montana residents supporting an initiative may associate, decreases the free flow of ideas, and slows the introduction of novel ideas, which are all counter to the First Amendment. *See Krislov v. Rednour*, 226 F.3d 851, 866 (7th Cir. 2000).

reducing the number of potential circulators imposed a severe burden on rights of political expression." *Id.* (citing *Buckley*, 525 U.S. at 194–95). Because the residency requirement here has the same effect, we reach the same conclusion in this case. Although *Nader* involved candidate petitions, initiative petitions and candidate petitions are treated similarly. *See Angle*, 673 F.3d at 1133. And while it is true that fourteen initiatives have qualified for the ballot under the scheme here whereas no independent presidential candidate had qualified under Arizona's restrictions, the evidence of interference with ballot access was mixed in *Nader* because other statewide independent candidates had qualified for the ballot. 531 F.3d at 1033. Importantly, just as in *Nader*, the restriction at issue here entirely precludes out-of-state residents from exercising a form of core political speech, reduces the pool of available circulators, and imposes a severe burden.[5]

---

[5] The conclusion that a residency requirement imposes a severe burden is also in line with the majority of the other circuits that have considered residency requirements for petition circulators. The Third, Fourth, Sixth, Seventh, and Tenth Circuits have all determined that residency requirements impose a severe burden. *Wilmoth v. Sec'y of N.J.*, 731 F. App'x 97, 103 (3d Cir. 2018) (candidate petition residency requirement); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013) (candidate petition residency requirement); *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008) (initiative petition residency requirement); *Nader v. Blackwell*, 545 F.3d 459, 475–76 (6th Cir. 2008) (candidate petition residency requirement); *Chandler v. City of Arvada*, 292 F.3d 1236, 1241 (10th Cir. 2002) (city initiative petition residency requirement); *Krislov*, 226 F.3d at 866 (candidate petition residency requirement in the 7th Cir.). Only the Eighth Circuit has concluded otherwise. *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001). *Nader* already registered our disagreement with the Eighth Circuit's reasoning on this issue. 531 F.3d at 1036–37.

Because the ban on out-of-state circulators at issue here imposes a severe burden on core political speech, strict scrutiny applies.

## 2.  Validity of Residency Requirement

To survive strict scrutiny, the residency requirement "must be narrowly tailored and advance a compelling state interest." *Angle*, 673 F.3d at 1132 (quoting *Prete*, 438 F.3d at 961).   Montana bears the burden of proving the requirement meets this standard.  *See Nader*, 531 F.3d at 1037.  It contends that it does because the requirement is narrowly tailored to prevent fraud and to advance self-government.

First, Montana argues the residency requirement is justified by its compelling interest in preventing fraud and protecting the integrity of the initiative process, pointing to Montana's actual experience with fraud in 2006.  Plaintiffs concede this is a valid and compelling state interest.  We also already recognized in *Nader* that preventing election fraud in the petition signature gathering process is a compelling interest.  *Id.*

Montana contends that the statute is narrowly tailored to target the specific fraud Montana experienced just before it passed this law, as the 2006 fraud was perpetrated predominantly by out-of-state residents.  It argues the law helps the state engage in proactive fraud prevention, which is necessary because there are short timelines around elections and Montana state law bars challenging the sufficiency of a petition after the election.  Plaintiffs contend that requiring circulators to submit to the jurisdiction of Montana for any investigation would more narrowly accomplish the same goals, and they point out that Montana has provided no evidence to prove that it would not.

Based on the record in *Nader*, we determined that requiring petition circulators to consent to the state's jurisdiction was a more narrowly tailored means of accomplishing the same interest as residency requirements. *Id.* at 1037–38. At the time, we recognized that courts had generally found the same. *Id.* at 1037. Other circuits have adopted this holding since *Nader*. Indeed, none of the other circuits that have squarely addressed this issue have found that a residency restriction is narrowly tailored in light of the fact that states could require consent to jurisdiction instead.[6]

Montana argues that despite this consensus among circuits, we should reach a different conclusion here than we did in *Nader*. It points out that it has offered evidence of actual fraud perpetrated by non-residents, whereas Arizona presented no such evidence. Although it is true that there is more evidence of prior fraud by non-residents in this case than was available in *Nader*, this history does not explain—and Montana offers no evidence showing—why a consent to jurisdiction system or another less restrictive system would be unworkable or otherwise insufficient to vindicate its compelling interest in addressing fraud. Montana therefore has not met its burden.[7]

---

[6] The Fourth, Sixth, Seventh, and Tenth Circuits have all determined that residency requirements are not narrowly tailored. *Judd*, 718 F.3d at 318 (4th Cir.); *Savage*, 550 F.3d at 1030–31 (10th Cir.); *Blackwell*, 545 F.3d at 475 (6th Cir.); *Chandler*, 292 F.3d at 1244 (10th Cir.); *Krislov*, 226 F.3d at 866 & n.7 (7th Cir.). The Third Circuit suggested this may be the case but remanded the issue to the district court for further development of the record. *Wilmoth*, 731 F. App'x at 104–05.

[7] Just like in *Nader*, this holding is based on the record before us. *See Nader*, 531 F.3d at 1038. If a state provided adequate evidence that other methods, such as consenting to jurisdiction, would be insufficient

Montana contends the residency restriction is also narrowly tailored to protect another compelling interest: the right of self-governance. The people's right to self-government is a compelling state interest. *See Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 531 (9th Cir. 2015) (en banc).

Montana has not met its burden of showing why this restriction is narrowly tailored to advance the interest in self-government. Montana offers no evidence or explanation for why this interest would not be vindicated through a system requiring that official proponents, petition signers, and voters on initiatives be residents. These restrictions on who may share in the legislative power at play in the initiative process would more directly protect the interest in self-government with only a minimal burden on political speech. *See id.* at 533 (explaining that restrictions on who may assume official roles in the initiative process only minimally burden First Amendment rights). Based on the record here, there is no evidence that a residency requirement for signature gatherers is necessary to adequately serve Montana's self-government interest.

Montana's residency requirement bans non-residents from participating in a form of core political speech entirely rather than confining the restriction to the narrower subset of conduct unique to residents in self-government. While it is one thing to limit carrying out the functions of self-government to residents, limiting core political speech to residents even on matters of state elections is a far broader restriction, and that restriction is not narrowly tailored here.

---

to further its interest in fraud prevention, it is possible that a residency requirement could survive.

In sum, because the residency requirement severely burdens core political speech and is not narrowly tailored to further a compelling state interest, it violates the First Amendment and cannot survive.

## B. Pay-Per-Signature Restriction

The second restriction at issue is the prohibition on paying signature gatherers "anything of value based upon the number of signatures gathered." Mont. Code Ann. § 13-27-102(2)(b).

### 1. Severe or Lesser Burden

Plaintiffs argue this pay-per-signature restriction also imposes a severe burden on speech. They contend that it reduces the pool of available circulators, makes signature gathering more expensive, limits the size of the audience proponents can reach, and makes it less likely that an initiative will gain ballot access.

Plaintiffs have not met their burden of showing that the pay-per-signature restriction imposes a severe burden on speech. The record provides little more than conclusory assertions about the burden, not actual evidence. We agree with the district court that the factual evidence Plaintiffs have provided is insufficient to demonstrate the existence of a severe burden. The main evidence, beyond conclusory statements, consists of (1) Ferrell's testimony that she does not want to work where she cannot be paid by the signature; (2) Silver Bullet's bid indicating that lifting both restrictions at issue here would save $1 per signature; and (3) Pierce's experience with a signature gatherer paid by the hour who was not even attempting to gather signatures.

This thin evidentiary record is insufficient to demonstrate a severe burden. Ferrell's testimony provides evidence of what only one professional petition circulator would do, not the effects on the entire pool of circulators. Silver Bullet's estimated cost savings included eliminating both restrictions, and therefore it is unclear how much can be attributed to the pay-per-signature restriction as opposed to the residency requirement. Finally, a single example of a worker shirking her responsibilities which could be resolved through other means is inadequate to conclude the restriction would constitute a severe burden.

The record thus does not support a conclusion that the payment restriction imposes a severe burden under either *Meyer* consideration. On the first *Meyer* consideration, the pay-per-signature restriction, unlike the residency requirement, does not categorically limit the pool of circulators. Instead, if some signature gatherers will only work on a per-signature basis, that is their choice. It is also unclear to what extent the restriction would cause circulators to refrain from working in Montana if they were otherwise permitted to. Other factors might prevent circulators from working in Montana. *See Prete*, 438 F.3d at 964. Increased costs may in some circumstances decrease the size of the audience reached, but the record does not substantiate how much of any cost increase can be attributed to this restriction.

As to the second *Meyer* consideration, the evidentiary support for Plaintiffs' contention that this restriction makes it less likely they will gain ballot access is also inadequate to meet their burden. Evidence on this factor is derived from conclusory statements, not empirical evidence. Moreover, just as with cost increases, Plaintiffs' evidence that the pay-per-signature restriction will decrease the likelihood of ballot access is also predicated on the residency requirement.

Therefore, it is altogether unclear how much less likely, if at all, proponents are to gain access because of the pay-per-signature restriction. Further illustrating this, the bid from AMT indicates that it does not pay per signature and yet it has still successfully qualified initiatives in Montana. In sum, the record here is insufficient to demonstrate that the pay-per-signature restriction imposes a severe burden.

This conclusion aligns with our holding in *Prete*. There, we concluded that the plaintiffs failed to demonstrate that a similar pay-per-signature restriction imposed a severe burden. *Id.* at 968. Although the record here and in *Prete* are not identical, they contain similar gaps. Plaintiffs here provide some evidence missing in *Prete*: testimony from someone who has circulated petitions in the relevant state and a bid that provides an estimate of the costs the restriction imposes in connection with another restriction. Still, like in *Prete*, this evidence is based primarily on conclusory statements, and it is unclear to what extent other factors— such as the residency requirement—are the cause of any burdens. *See id.* at 964–65. Just as in *Prete*, the record here is insufficient to establish the pay-per-signature restriction imposes a severe burden.[8]

To be sure, it is possible for payment restrictions to impose a severe burden. For example, the Supreme Court held in *Meyer* that a complete ban on paying petition

---

[8] This conclusion is in line with the other circuits that have upheld similar pay-per-signature prohibitions for petition circulators. *See Person v. N.Y. State Bd. of Elections*, 467 F.3d 141, 143 (2d Cir. 2006) (holding that the argument that per-signature payment is the best incentive is not enough to show that restricting per-signature payments is unduly burdensome); *Jaeger*, 241 F.3d at 618 (holding that offering only bare assertions of a burden is insufficient to establish that a restriction on per-signature payments imposes a severe burden).

circulators imposes a severe burden.  486 U.S. at 422–24.[9]
Unlike *Meyer*, however, the restriction here is not a complete
prohibition on any form of payment.  Instead, the restriction
only bars being "paid anything of value based upon the
number of signatures gathered."  Mont. Code Ann. § 13-27-
102(2)(b).   In other words, it only prohibits one form of
payment.  Proponents can pay based upon time.  They also
can use compensation and employment schemes based on
other metrics—such as paying bonuses for quality, payment
based on signature validity rates, or terminating
unproductive circulators.  Plaintiffs fail to even address why
their concerns about managing circulator performance
would not be resolved by adopting one of these other
available methods.  This further underscores that Plaintiffs'
conclusory assertions are insufficient to show a severe
burden.  *See Prete*, 438 F.3d at 968.

While it may be possible to demonstrate that a pay-per-
signature restriction—including this one—imposes a severe
burden, the record before us is insufficient to support such a
finding.   Therefore, the district court properly refused to
apply strict scrutiny; this lesser burden is only subject to a
less exacting review.

---

[9] At least one circuit has held that a ban on all forms of payment
other than on a per-time basis imposes a severe burden.  *See Citizens for
Tax Reform v. Deters*, 518 F.3d 375, 386–87 (6th Cir. 2008).  *Deters*
specifically distinguished *Prete*, because the law at issue in *Deters*
allowed payment *only* "on the basis of time worked."  *Id.* at 377, 385–
86.  The Sixth Circuit noted that limiting compensation to only one form
barred schemes that considered productivity, longevity, and geography.
*Id.* at 385–86.   The restriction in *Deters* may have even precluded
terminating unproductive circulators.  *Id.* at 386.  The law at issue here
contains no such restrictions.

## 2. Validity of Pay-Per-Signature Restriction

Under less exacting review, Montana must only demonstrate that the restriction "furthers 'an important regulatory interest.'" *Angle*, 673 F.3d at 1134–35 (quoting *Prete*, 438 F.3d at 969). "In applying this standard, we bear in mind that 'States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally.'" *Id.* at 1132 (quoting *Buckley*, 525 U.S. at 191).

As discussed above, it is undisputed that Montana has an important interest—indeed a compelling interest—in preventing fraud and protecting the integrity of the initiative process.

*Prete* is once again instructive on this issue. There, we held that a very similar pay-per-signature restriction furthers an important state interest in preventing fraud. *Prete*, 438 F.3d at 970–71. We reach the same result here and uphold the restriction.[10]

Montana passed this law in response to fraud connected with gatherers paid on a per-signature model, and the law targets this fraud. The record also includes evidence that per-signature payment arrangements encourage, and are "regularly stung" by, fraud. Montana has explained that its tight election timelines mean that it must adopt measures like these to proactively prevent fraud, since the sufficiency of a

---

[10] Indeed, every circuit to apply less exacting review to a similar pay-per-signature restriction has found the restriction survives. *See Person*, 467 F.3d at 143; *Jaeger*, 241 F.3d at 618; *see also Voting for Am., Inc. v. Steen*, 732 F.3d 382, 398–99 (5th Cir. 2013) (upholding a similar restriction applied to voter registration applications).

petition cannot be examined after the election.  *See* Mont. Const. art. III, § 4, cl. 3.  Moreover, the restriction rationally reduces the incentive to forge signatures and commit fraud.

Plaintiffs propose other methods they assert would also reduce fraud.  Once a non-discriminatory restriction is determined to impose a lesser burden, however, it is not our duty "to determine whether the state's chosen method for prevention of fraud is the best imaginable." *Prete*, 438 F.3d at 971.  We are limited to examining whether the restriction is "reasonably related to the important regulatory interest." *Id.*  As the district court determined, the pay-per-signature restriction meets this test.[11]

Based on the record produced here, we hold that Montana's pay-per-signature restriction is compatible with the First Amendment.

## IV. Conclusion

By flatly banning all non-residents from participating in a form of core political speech, Montana's residency requirement for petition circulators imposes a severe burden on First Amendment rights and thus it must withstand strict scrutiny.  Although the state has a compelling interest in preventing fraud, the state has failed to demonstrate that this ban is narrowly tailored to serve this interest when other, narrower options are available.  Therefore, on the record

---

[11] To be clear, as in *Prete*, we do not hold that pay-per-signature restrictions are per se constitutional.  *See Prete*, 438 F.3d at 953 n.5. Rather, we hold that Plaintiffs have failed to show that the payment restriction at issue here imposes a severe burden under the First Amendment and that it furthers Montana's important regulatory interest under less exacting review.  Therefore, we express no opinion as to whether the restriction would survive strict scrutiny.

before us, Montana's residency requirement is incompatible with the First Amendment and cannot survive. The judgment of the district court with regards to § 13-27-102(2)(a) is **REVERSED** and **REMANDED** with instructions to enter partial summary judgment in favor of Plaintiffs on this issue.

Based on the record Plaintiffs produced here, Montana's restriction on paying petition circulators on a per-signature basis imposes only a lesser burden by merely banning one type of payment scheme while leaving numerous other options available. Montana has sufficiently demonstrated that prohibiting payment by the signature furthers its important regulatory interest in preventing fraud in the initiative process. Therefore, on the record before us, Montana's pay-per-signature restriction does not violate the First Amendment. We **AFFIRM** the judgment of the district court with regards to § 13-27-102(2)(b).

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS. THE PARTIES SHALL BEAR THEIR OWN COSTS ON APPEAL.**