**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COMMITTEE TO RECALL DAN
HOLLADAY; JEANA GONZALES;
ADAM MARL,

No.23-35107

D.C. No. 3:20-cv-
01631-YY

*Plaintiffs-Appellants*,

  v.

JAKOB WILEY, City Recorder for
the City of Oregon City, in his official
capacity,

ORDER

*Defendant-Appellee*,

STATE OF OREGON,

*Intervenor-Defendant-
Appellee*.

Filed October 23, 2024

Before:  John B. Owens and Michelle T. Friedland, Circuit
Judges, and Douglas L. Rayes,[*] District Judge.

Order;
Dissent by Judge Bumatay

---

[*] The Honorable Douglas L. Rayes, United States District Judge for the District of Arizona, sitting by designation.

**SUMMARY**[**]

**Matter: Elections/Voter Initiatives**

The panel denied a petition for rehearing en banc in a case in which the panel (1) affirmed the district court's dismissal of a federal and state constitutional challenge to Oregon's 90-day signature gathering deadline for Oregon recall petitions; and (2) remanded for the district court to reconsider whether to grant leave to amend on the federal claim, whether to exercise supplemental jurisdiction over the state law claim, and whether to certify any question related to plaintiffs' state law claim to the Oregon Supreme Court.

Dissenting, Judge Bumatay, joined by Judges Bennett, R. Nelson, and VanDyke, wrote that this court should reconsider its decision in *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012), which requires the application of First Amendment strict scrutiny to any regulation that significantly inhibits the placement of voter initiatives on the ballot. Nothing in the text, history, and tradition of the First Amendment supports the application of heightened scrutiny over state ballot initiatives and other direct democracy petitions. Throughout our history, when the States have permitted citizens to participate directly in democracy, they have also significantly limited their say on which issues got put to a vote. The Court's free speech jurisprudence doesn't require heightened scrutiny for neutral rules that lay out the prerequisites for ballot qualification unless a state regulation restricts citizens' ability to speak out on an issue of political

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

change.  The decision in *Angle* poses a threat to federalism by forcing district courts to override state election laws and grant political wins to litigious ballot proponents.  Finally, the decision in *Angle* puts this court at odds with the majority of the other circuits.

---

## **ORDER**

Judge Owens and Judge Friedland have voted to deny Appellee's petition for rehearing en banc and Judge Rayes so recommends.

The full court has been advised of the petition for rehearing en banc.  A judge of the court requested a vote on en banc rehearing.  The majority of the active judges have voted to deny rehearing the matter en banc.  Fed. R. App. P. 35(f).  Judge Forrest and Judge H.A. Thomas did not participate in the deliberations or vote in this case.

The petition for rehearing en banc is DENIED.  Judge Bumatay's dissent from the denial of en banc rehearing is filed concurrently herewith.

BUMATAY, Circuit Judge, joined by BENNETT, R. NELSON, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

The right to speak out is not a right to prevail. While the First Amendment guarantees freedom of speech, nothing in that constitutional provision means that a person's position on an issue must become law or even be voted on. A dissenting opinion, like this one, provides a fitting example of this principle. I called this case en banc because I thought our court needed to reconsider our decision in *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012). In that case, the Ninth Circuit held that the First Amendment requires that we apply strict scrutiny to any regulation that "significantly inhibit[s]" the placement of voter initiatives on the ballot. *Id.* at 1133. *Angle* needs to be revisited because it departs from the text and historical understanding of the First Amendment.

But a majority of my colleagues disagree. Because there weren't enough "yes" votes to rehear this case en banc, *Angle* remains the binding law of this circuit. While our failure to jettison this precedent was wrong, no one would seriously contend that my inability to prevail on an en banc vote means that I was unable to effectively address the legal issues brought before our court. That my views are relegated to a dissental doesn't mean that my judicial role was inhibited or that our en banc rules need fixing. The same goes for free speech. Having strong views on a political issue doesn't equate to a right to have the issue voted on by the people. But this is the slippery slope that *Angle* creates. It extrapolates a right to put an issue on the ballot from the right to advocate for an issue. That's simply incorrect.

In our republican system, States are under no obligation to allow their citizens to legislate directly. *See id.* at 1133.

Yet, throughout history, States have done so.  States have long experimented with direct democracy—granting their citizens the opportunity to vote directly, rather than through their elected representatives, on discrete policy issues. These opportunities come in several forms: ballot initiatives (citizens vote to enact state laws or state constitutional amendments), recall elections (citizens vote to remove their state representatives), or referenda (citizens vote to "veto" a state law).  *See* Henry Noyes, *Direct Democracy as a Legislative Act*, 19 Chap. L. Rev. 199, 200 (2016).  Often, States enact reasonable, nondiscretionary regulations governing these direct democracy petitions.  Take commonplace petitioning requirements.  They generally require the collection of a minimum number of supporting signatures within a specific timeframe before an issue may take a spot on the ballot or a recall election may be set.

Into this realm of direct democracy, the Ninth Circuit has inserted itself and the First Amendment's free speech right. *Angle* subjects any ballot access rule to exacting judicial scrutiny if the regulation makes it *too difficult* for the direct democracy petition to succeed.  This applies even if the rules are neutral, procedural regulations.  Under the guise of protecting "political speech," *Angle* requires strict scrutiny for all regulations that "significantly inhibit the ability of initiative proponents to place initiatives on the ballot."  673 F.3d at 1133.  This is measured from the perspective of the so-called "hypothetical reasonably diligent initiative proponent."  *Pierce v. Jacobsen*, 44 F.4th 853, 861 n.3 (9th Cir. 2022).  The reasoning goes that if a ballot petition fails, fewer people talk about its proposal—the "total quantum of speech" in society on that topic is diminished—and that's enough to justify a federal court's intervention under the Free Speech Clause.  *Angle*, 673 F.3d at 1133.  Less

burdensome regulations, meanwhile, are subject to more relaxed scrutiny and need only further "an important regulatory interest." *Id.* at 1135. While the First Amendment establishes a right to *advocate* for an idea, *Angle* goes much further and mandates strict scrutiny anytime a law merely "make[s] it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot." *Id.* at 1132.

Nothing in the text, history, and tradition of the First Amendment supports this expansion of judicial power over state ballot initiatives and other direct democracy petitions. Throughout our history, when States have permitted citizens to participate directly in democracy, they have also significantly limited their say on which issues got put to a vote. That was as much true with Georgia's Founding-era initiative process as with the bevy of States during Reconstruction that allowed the people to vote directly on constitutional amendments. The modern ballot initiatives and referenda that began at the turn of the century are no different. At no point did the people think the free speech right had anything to say on the neutral rules governing the operation of these direct democracy petitions. Absent evidence to the contrary, this lack of any First Amendment regulation of citizen-driven petitions over the last two centuries suggests that they fall outside the Free Speech Clause's scope.

And nothing in Supreme Court precedent requires the *Angle* regime. To be sure, the Court has recognized that the First Amendment protects against regulations that burden citizens' "interactive," "one-on-one communication" supporting initiatives or that limit petition circulation. *See Meyer v. Grant*, 486 U.S. 414, 422, 424 (1988) (invalidating a state law making it a felony to pay petition circulators).

Advocating to a fellow citizen "that [a] matter is one deserving of the public scrutiny and debate" is "core political speech." *Id.* at 421–22. State laws that prevent citizens from expressing their views on the worthiness of a ballot initiative should be subject to heightened scrutiny.

But this logic runs out when it comes to the neutral laws that structure the petitioning process itself—the hoops that proponents must jump through to get their proposal on the ballot. After all, "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 191 (1999). How many signatures must a proponent collect in support of his initiative? By what date? Must the signatories all live in Portland? The answers to these questions will set the baseline rules of the game. But once the game gets going, these laws don't restrict citizens' political communications with others or limit who can spread political messages. And for the First Amendment, that makes all the difference. *Meyer* and its progeny protect citizens' interactive, one-on-one communications that take place during advocacy—it doesn't guarantee any level of success for that advocacy. And so, unless a state regulation restricts citizens' ability to speak out on an issue of political change, the Court's free speech jurisprudence doesn't require heightened scrutiny for neutral rules that lay out the prerequisites for ballot qualification.

The Ninth Circuit's outlier position on the scope of the First Amendment has been noticed. Four Justices of the Supreme Court have expressed their doubts about *Angle*. *See Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2617 (2020) (Roberts, C.J., joined by Justices Alito, Gorsuch, and

Kavanaugh, concurring) (doubting a First Amendment challenge to "the most typical sort of neutral regulations on ballot access"). And a host of other circuits have refused to read the First Amendment right as broadly as we have. *See, e.g.*, *Dobrovolny v. Moore*, 126 F.3d 1111, 1112–13 (8th Cir. 1997); *Marijuana Pol'y Project v. United States*, 304 F.3d 82, 86 (D.C. Cir. 2002); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1099 (10th Cir. 2006) (en banc); *Molinari v. Bloomberg*, 564 F.3d 587, 599–600 (2d Cir. 2009); *Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 938 (7th Cir. 2018). *But see Thompson v. DeWine*, 959 F.3d 804, 808 (6th Cir. 2020) (per curiam). A member of our court has also cast doubt on *Angle*, urging en banc review. *See People Not Politicians Or. v. Clarno*, 826 F. App'x 581, 584 (9th Cir. 2020) (R. Nelson, J., dissenting).

Ultimately, it's federalism that suffers. Following *Angle* and its progeny, courts within the Ninth Circuit have taken it upon themselves to rewrite the neutral, nondiscriminatory state procedures that structure ballot initiatives and the like to give proponents a better shot. *See, e.g.*, *Fair Maps Nevada v. Cegavske*, 463 F. Supp. 3d 1123 (D. Nev. 2020) (extending signature deadline for proposed constitutional amendment); *Reclaim Idaho v. Little*, 469 F. Supp. 3d 988 (D. Idaho 2020) (requiring Idaho to either lower signature threshold or eliminate in-person signature requirement for legislative initiative), *stay granted*, 140 S. Ct. 2616, *remanded*, 826 F. App'x 592 (9th Cir. 2020); *People Not Politicians Oregon v. Clarno*, 472 F. Supp. 3d 890 (D. Or. 2020) (lowering threshold for signature requirement to amend the Oregon Constitution), *stay granted*, 141 S. Ct. 206, *remanded*, 826 F. App'x 581 (9th Cir. 2020).

Absent content- or viewpoint-based restriction of political speech, States should be free to experiment with

ballot initiatives, recall elections, and referenda as they see fit.  These decisions involve fundamental questions of state policy and the finetuning of the democratic process.  As part of the *least* democratic branch of the *federal* government, we must tread lightly here.  Indeed, if the First Amendment protected against rules that make some political outcomes less likely, that would be grounds for federal courts to intrude on all sorts of state political activity, like state supermajority rules and veto rules, and may discourage these direct democracy petitions.  Since *Angle* has no support in history and tradition or Supreme Court precedent, and comes at a great price to federalism, we should have reconsidered it en banc.

And there was no better opportunity to reconsider *Angle*. Here, no hot-button proposal looms over the case.  No election awaits right around the corner.  No emergency stay hangs over the parties.  Nothing forces us to expedite consideration of the matter.  In fact, the plaintiffs here got all the signatures they needed for their recall petition and the recall succeeded.  The controversy only remains live because the plaintiffs seek nominal damages, declaratory relief, and injunctive relief for future petitions.  *See Comm. to Recall Dan Holladay v. Wiley*, No. 23-35107, 2024 WL 1854286, at \*2 (9th Cir. 2024).  And overruling *Angle* would have put these issues to rest.  Safe from the pressures of a political battle, we should have reconsidered *Angle* when we could give it our best attention.

## I.

## Background

Let's begin with some background on this case.  Like many States, Oregon permits its citizens to recall their elected officials.  Citizens who wish to recall a public official

can circulate a petition for signatures. If the petition receives the signatures of 15% of the electorate, then the public official must stand for a recall election. Or. Const. art. II, § 18. Proponents of the recall election have 90 days to collect and submit these signatures. Or. Rev. Stat. § 249.875(1).

Plaintiffs Jeana Gonzalez, Adam Marl, and the Committee to Recall Dan Holladay organized a recall campaign against the mayor of Oregon City, Dan Holladay. They collected the requisite number of signatures in the 90-day timeframe. But they brought this suit for nominal damages, declaratory relief, and prospective relief to challenge Oregon's 90-day limit on recall petitions under the First Amendment. Their argument? Most recall campaigns in Oregon fail largely "due to lack of adequate time to gather signatures," making the 90-day limit an unconstitutional, severe burden on their First Amendment right under *Angle*. Plaintiffs sued the city recorder, Jakob Wiley, in his official capacity, and the State of Oregon intervened to defend the constitutionality of the 90-day limit.

The district court held that Plaintiffs had standing to bring their facial First Amendment challenge because at least one plaintiff planned to organize future recall petitions. On the merits, the district court ruled that they failed to state a claim under *Angle* because they failed to show that "reasonably diligent" proponents couldn't "normally" qualify for a recall election. The district court also refused Plaintiffs permission to amend their complaint.

On appeal, a panel of this court reversed in part. After satisfying itself that the case was justiciable, the panel turned to the merits. *See Committee to Recall*, No. 23-35107, 2024 WL 1854286, at *2. Critically, the panel rejected any

argument to narrow *Angle*.   It reasoned that "[r]ecall elections affect the total quantum of speech on a particular issue by affecting the timing and context of an election," and thus the "logic underlying the *Angle* test applies equally to laws regulating recall petitions." *Id.*

Analyzing the case under *Angle*'s framework, the panel held that Plaintiffs failed to allege "facts sufficient to subject the 90-day deadline to strict scrutiny." *Id.*  That's because Plaintiffs' allegations failed to show that the deadline "significantly inhibits the ability of recall proponents to place a recall on the ballot." *Id.* (simplified).  And the 90-day deadline survived less-exacting review because it "serves the important regulatory interest[s]" of ensuring that the recall effort "has sufficient grassroots support before holding a recall election" and "preventing abuse of the recall process." *Id.* at *3.

But the panel also held that the district court abused its discretion in denying Plaintiffs leave to amend their *Angle* claim. *Id.* at *4.  The panel noted that the district court's decision was based on an erroneous justiciability analysis and on an impermissible assumption that Plaintiffs could not produce data to support their allegations. *See id.* at *3.  The panel thus vacated the denial of leave to amend and remanded for further proceedings in which the district court could either grant leave to amend on the *Angle* claim or provide a clearer explanation for not doing so. *See id.* at *4.

The State of Oregon sought en banc review.  Rather than expanding *Angle*, on en banc review, we should have discarded it completely.

## II.

## The History of the First Amendment and Direct Democracy Initiatives

The Free Speech Clause of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  This case asks—what does the Free Speech Clause have to say about the neutral rules that States may place on direct democracy initiatives?

In considering the Free Speech Clause's impact on these ballot access rules, "we can consider its history and tradition." *Vidal v. Elster*, 602 U.S. 286, 301 (2024); *see also* Randy E. Barnett & Lawrence B. Solum, *Originalism after* Dobbs*,* Bruen*, and* Kennedy*: The Role of History and Tradition*, 118 Nw. U. L. Rev. 433, 446 (2023) (explaining that, at a minimum, history and tradition can serve as "[e]vidence of the original public meaning of the constitutional text").  As the Court recently held, a regulation's "longstanding coexistence" with the First Amendment suggests that the constitutional provision requires no "heightened scrutiny" of the regulation. *Vidal*, 602 U.S. at 300.

As a matter of history, direct democracy was generally disfavored at the Founding.  Its few manifestations around the ratification of the First Amendment were limited.  Direct democracy became more common in state constitutional amendment procedures around Reconstruction and the ratification of the Fourteenth Amendment.  During this period, state governments determined which issues made it onto the ballot—despite state and federal free speech rights.  And when ballot initiatives, referenda, and recall votes gained traction at the turn of the 20th century, the Free

Speech Clause still did little to override state restrictions imposed on them.  Absent evidence to the contrary, the lack of any First Amendment regulation of neutral citizen-driven ballot restrictions over the last two centuries supports that they fall outside the Free Speech Clause's scope.

In other words, from the Founding to well into the 20th century, reasonable procedural restrictions on what may appear on the ballot have "always coexisted with the First Amendment" and its state equivalents.  *See id.* at 295.  And this "longstanding coexistence" indicates that neutral limitations on direct democracy initiatives have never "been a cause for constitutional concern."  *See id.* at 295–96.  Thus, this historical understanding shows that procedural ballot access regulations, like Oregon's signature-gathering timeframe, are "compatible with the First Amendment" and need not be evaluated under "heightened scrutiny."  S*ee id.* at 301.

### A.

### Founding-Era History

The Constitution was in many ways designed to place representatives between the people and discrete policy decisions.  *See, e.g.*, Julian N. Eule, *Judicial Review of Direct Democracy*, 99 Yale L. J. 1503, 1523 (1990); *see also* The Federalist No. 10 (Madison) (arguing that "a pure democracy . . . can admit of no cure for the mischiefs of faction," and advocating for "a republican remedy for the diseases most incident to republican government"); *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 793 (2015) ("Direct lawmaking by the people was virtually unknown when the Constitution of 1787 was drafted." (simplified)).  Experiments with direct democracy at this time were rare.

According to some historians, what drove the constitutional convention in Philadelphia was not the weakness of the Articles of Confederation, but populism in the state governments.  Eule, *supra*, 1523.  Indeed, concerns about the potential unrestrained majoritarianism of direct democracy are prevalent throughout the Federalist Papers.  *Id.* at 1522.  Madison predicted that if "a majority be united by a common interest" then "the rights of the minority will be insecure."  The Federalist No. 51; *see also* The Federalist No. 49 (Madison) (expressing concern for the "danger of disturbing the public tranquillity [sic] by interesting too strongly the public passions"); The Federalist No. 63 (Madison) ("[T]here are particular moments in public affairs . . . when the people stimulated by some irregular passion . . . may call for measures which they themselves will afterwards be the most ready to lament.").  At the Constitutional Convention, Edmund Randolph complained of "the . . . follies of democracy" and Roger Sherman hoped that the people would "have as little to do as may be about the government."  Eule, *supra*, at 1523 n.79.

That's not all.  Later, Madison and other Federalists "labored mightily" to block an attempt to include in the First Amendment a right of the people to "instruct their representatives" in case the representatives might "feel bound to follow the instructions."  *Id.* at 1523.  This context alone might cause one to raise an eyebrow at the claim that the original understanding of the Free Speech Clause contained some special solicitude for the success of ballot petitions.

Yet there were *some* strands of direct democracy at the Founding.  In theory, Thomas Jefferson argued that a federal constitutional convention should be called whenever a conflict between the three branches of government arose.

*See* Harry N. Scheiber, *Foreword: The Direct Ballot and State Constitutionalism*, 28 Rutgers L. J. 787, 816 n.98 (1997). And some forms of direct democracy made it into state constitutions. For one, unlike the federal government, most states *did* reserve the right "to instruct their representatives" to their citizens. *See* Vikram David Amar, *The People Made Me Do It: Can the People of the States Instruct and Coerce Their State Legislatures in the Article V Constitutional Amendment Process*, 41 Wm. & Mary L. Rev. 1037, 1048 (2000).

At the Founding, at least one State, Georgia, had an initiative procedure—complete with basic rules that set the bar for when political advocacy would turn into legal action. Georgia's 1777 Constitution was the "solitary instance" of a ballot initiative in a state constitution during the Revolutionary era. C.B. Galbreath, *Provisions for State-Wide Initiative and Referendum*, 43 Annals Am. Acad. Pol. & Soc. Sci. 81, 83 (1912). Citizens could petition to gather signatures in support of a proposed constitutional amendment. Ga. Const. of 1777, art. LXIII. Signatures from a majority of voters in a majority of counties required the general assembly to call a constitutional convention "for that purpose." *Id.* Thus, the Georgia Constitution imposed both a significant geographical distribution requirement (voters from each county must sign) and a high percentage requirement (simple majority). That procedure coexisted with a somewhat analogous protection of public discourse elsewhere in the constitution. *Id*. art. LXI ("Freedom of the press [is] … to remain inviolate forever"). Assuming that people understood constitutional provisions as harmonious parts of a coherent document, these two articles evidence that, at least in Georgia, the protection of public discourse

was not understood to demand flexibility in ballot qualification rules.

## B.

### Reconstruction-Era History

Closer to Reconstruction, the procedures by which state constitutions were amended often involved a popular vote on the amendment itself.  Yet despite the direct role the people played in this process, governmental bodies had discretion over which amendments got voted on by the people and which didn't.  These mechanisms limited which proposals qualified for the ballot—they did not maximize popular discussion of proposals.  These contemporary understandings of state free speech protections help paint a picture of how the Reconstruction generation understood the federal free speech right it incorporated through the Fourteenth Amendment.

During the Antebellum and Reconstruction eras, many state constitutions provided that the people could vote directly to ratify a proposed amendment.  But despite free-speech guarantees in these constitutions, citizens had essentially no right to use government procedures to get others talking about their preferred amendments.  Take the Mississippi Constitution of 1868.  Its Bill of Rights guaranteed "freedom of speech and of the press."  Miss. Const. of 1868, Bill of Rights § 4.  And that Constitution let "qualified electors . . . vote directly for or against" constitutional amendments.  *Id.* art. XIII.  But it nonetheless took a two-thirds vote of each branch of the state legislature—three separate times, on different days—to get the proposed amendment before the people for a vote.  *Id.*

Same with the Alabama Constitution of 1865.  Under that Constitution, "every citizen [could] freely speak, write, and publish his sentiments on all subjects."  Ala. Const. of 1865, art. I, § 5.  Similar to Mississippi, the "qualified electors of the State, who voted for representatives," could vote directly on proposed constitutional amendments.  *Id.* art. IX, § 1.  Yet there too a two-thirds majority of each house of the legislature had to vote to propose the amendment in the first place.  *Id.*  Plus, it was left to the legislature to decide how to publish notice of the proposal ahead of the people's vote.  *Id.*

Similar examples abound from States across the Union. *See, e.g.*, Va. Const. of 1869, art. I, § XIV ("any citizen may speak, write and publish his sentiments on all subjects") & art. XII (requiring a majority vote by two successive sessions of the legislature to put proposed amendment to a popular vote and granting discretion to the legislature to determine the manner of public notice); Ga. Const. of 1868, art. I, § 9 ("every citizen may freely speak, or write, or print on any subject") & art. XII, § 1 ("This constitution may be amended by a two-thirds vote of two successive legislatures, and by a submission of the amendment to the qualified voters for final ratification…"); N.C. Const. of 1868, art. I, § 14 ("Freedom of speech and of the press … shall never be restrained…") & art. XIII, § 4 (requiring a three-fifths vote of each house of the legislature to submit a proposed amendment to the people for a ratifying vote in a manner determined by the legislature); Cal. Const. of 1879, art. I, § 9 ("Every citizen may freely speak, write, and publish his sentiments, on all subjects…") & art. XVIII, § 1 (requiring a two-thirds vote of each legislative house to send a proposed amendment to the people for a ratifying vote); Or. Const. of 1857, art. I, § 8 & art. XVII, § 1 (similar); Ill. Const. of 1848, art. XII, § 2 &

art. XIII, § 23 (similar); Mich. Const. of 1850, art. IV, § 42 & art. XX, § 1 (similar); Kan. Const. of 1861, Bill of Rights, § 11 & art. XIV, § 1 (similar); S.C. Const. of 1868, art. I, § 7 & art. XV, § 1 (similar); Me. Const. of 1820, art. I, § 4 & art. X, § 4 (similar); La. Const. of 1868, tit. I, art. 4 & tit. IX, art. 147 (similar); N.J. Const. of 1844, art. I, § 5 & art. IX (similar); N.Y. Const. of 1846, art. I, § 8 & art. XIII, § 1 (similar); Tenn. Const. of 1870, art. I, § 19 & art. XI, § 3 (similar).

Popular ratification of constitutional amendments was a limited form of direct democracy common at the state level during the early- to mid-19th century.  But with this direct citizen participation came considerable legislative constraints on which constitutional amendments would make it before the voters in the first place.  And this formula coexisted with state and federal free-speech guarantees leading up to and during the Reconstruction era.  All the more evidence, then, that the Reconstruction generation did not understand the First Amendment's Free Speech Clause to contain some special concern for the "total quantum of speech" on political proposals once the power to legislate directly was granted to the people.

## C.

### 20th-Century Initiatives

Ballot initiatives, referenda, and recall votes exploded onto the scene in the Progressive Era at the turn of the 20th century.  *See* Eule, *supra*, at 1512.  "[W]idely perceived corruption and control of legislatures by corporate wealth" led many Western states to amend their constitutions to place "corrective power in the citizenry."  *Id.*  These amendments, and the laws that operationalized them, permitted citizens to propose and enact new laws or hold referenda to veto acts of

the legislature.  And they all imposed basic requirements for a proposal to appear on the ballot.  *See* Galbreath, *supra*, at 87–106.   Such requirements persisted through the 20th century, often causing more initiatives to fail to qualify for the ballot than to succeed.  *See* David B. Magleby, *Let the Voters Decide? An Assessment of the Initiative and Referendum Process*, 66 U. Colo. L. Rev. 13, 22, 27–28 (1995).

Beginning with South Dakota in 1898, a sea-change swept through the West as States began to adopt the ballot initiative or referenda through constitutional amendment.  By 1908, seven more States followed suit.  *See Scheiber*, *supra*, at 793.   Though reformers first met with great resistance from political figures like William Howard Taft, they eventually won broad support, even converting the once-skeptical Woodrow Wilson to their cause.  *Id.* at 791–93.  From the emergence of these ballot initiatives down to today, there have always been laws setting the bar for which proposals would appear before voters at the ballot box.

Here's some examples.   South Dakota's legislature passed a statute in 1899 operationalizing its constitutional referendum procedure.  To kick off a referendum vote, a citizen had to file a petition signed by 5% of eligible voters with the secretary of state at least 90 days after the close of the session of the legislature in which the challenged law was passed.   Galbreath, *supra*, at 88.   The referendum amendment itself set 5% as the ceiling on signatures the legislature could require.  *Id.*  Utah granted its legislature much wider discretion to organize the initiative process.  *Id.* at 90 ("The legal voters … under such conditions and in such manner as may be provided by law, may initiate any desired legislation…").    Oregon's   amendment   allowed   the legislature to require signatures of up to 8% of eligible voters

on a state-wide ballot initiative petition, and to impose a deadline to submit that petition at least four months before the relevant election. *Id.* at 92. The ceiling for state-wide referenda was 5%, but at the city level the percentage of signatures required for initiatives could be as high as 15%. *Id.* at 92–93. In Michigan, signatures by 25% of the number of voters in the last election for secretary of state were necessary to get a constitutional amendment on the ballot. *Id.* at 104.

Other States had similar requirements. Nevada in 1904 set the floor at 10% for initiatives. Nev. Const., art. XIX, § 1 (amended 1962). Montana set it at 8% for initiatives with signatures coming from at least two-fifths of counties. Galbreath, *supra*, at 99. Oklahoma's 1907 constitution, still in effect today, set these numbers at 15% for a proposed constitutional amendment, 8% for a legislative measure, and 25% for an initiative that failed to get enough signatures the first time. Okla. Const., art. V, § 2, 6. Maine required 12,000 signatures for initiatives. Galbreath, *supra*, at 101.

The point here is not to split hairs over percentages. It's to make the simple observation that ballot initiatives and referenda rights have, from the start, been accompanied by procedural rules designed to regulate which proposals make it onto the ballot. These rules have long been part of the essential structure of direct democracy. And far from a consensus that the Free Speech Clause required loosening these rules, even supporters of these reforms recognized that direct democracy *needed* strict procedures to flourish. *See, e.g.*, W. F. Dodd, *Some Considerations upon the State-Wide Initiative and Referendum*, 43 Annals. Am. Acad. Pol. & Soc. Sci. 203, 208 (1912). Initiatives and referenda, from the start, were experiments that implicated fine calibrations

of political science—not the maximization of political discourse.

That remained true throughout the 20th century. Median statutory and constitutional initiative signature requirements between 1950 and 1992 were 8% and 10%, respectively. Magleby, *supra*, at 22. And where the data is available, it shows that these rules have made the initiative process far from easy. Excepting the 1950s, in 20th-century California, at least half of all initiatives approved for circulation on a petition did not qualify for the ballot. *Id.* at 27–28. Thus, for their hundred-year or so modern history, ballot initiative and referenda laws have set high bars that many proposals fail to meet.

* * *

Taking stock, the history of direct democracy in the United States establishes that neutral procedures governing which issues will appear before voters—and which won't—have always been a state function and generally outside the scope of the First Amendment. From Founding-era state constitutional amendment procedures to 20th-century ballot initiatives and referenda, the constitutional right to free speech, and its state equivalents, didn't interfere with state rules governing their operation. So it's doubtful that the original public meaning of the Free Speech Clause protects against an uphill fight to get a proposal on the ballot—simply for the sake of "more speech."

## III.

### Supreme Court Precedent Doesn't Justify *Angle*

Given this history, it's no surprise that *Angle* also lacks a basis in Supreme Court precedent. *Angle* itself relied on *Meyer*, the central Supreme Court case on ballot initiatives

and the First Amendment, to justify its intrusion into state political processes.   But *Meyer* protects against state regulations that interfere with a citizen's ability to engage in one-on-one political speech with others when seeking to place an issue on the ballot.  *Meyer* said nothing about the neutral laws setting the ground rules for what it takes to place an issue on the ballot.   Instead, *Angle* took the Court's concern for the "total quantum of speech" when citizens' speech rights are restricted to aggrandize federal courts' role over all kinds of state political activity—without any limiting principle.  We should have reconsidered it en banc.

## A.

Start with *Meyer*.  At issue in that case was Colorado's ballot initiative process.  Proponents of a ballot initiative had six months to obtain a minimum number of supporting signatures on an initiative petition.  *Meyer*, 486 U.S. at 416. But Colorado law also made it a felony to pay petition circulators.  *Id.* at 417.  This criminal prohibition defied the First Amendment.

*Meyer* first explained why the criminal prohibitions implicated the First Amendment's free speech protections at all.   To start, the Court observed that any "interactive communication concerning political change" constitutes "core political speech."   *Id.* at 421–22.   Citizens who circulate petitions engage in this "core political speech" because they "will at least have to persuade [potential signatories] that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate." *Id.* at 421.  Moreover, petition circulation "of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change."  *Id.*  So any restriction on the individual

petition circulators' "advocacy [for] political reform" burdens "core political speech." *Id.* at 421 & n.4.

The Court then noted two ways in which Colorado's criminal prohibition on paid petition circulators restricted political expression:

> First, it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion.

*Id.* at 422–23 (simplified). The Court then observed the Colorado Supreme Court's conclusion that the law would have "the inevitable effect of reducing the total quantum of speech on a public issue." *Id.* at 423.

Thus, Colorado's burden on its citizens' direct "one-on-one" conversations triggered "exacting scrutiny." *Id.* at 420, 424. And because Colorado did not show that "it is necessary to burden appellees' ability to communicate their message" to protect the integrity of its initiative process, the Court invalidated the law. *Id.* at 426. So at bottom, *Meyer* was about burdening proponents' chosen *means* of expressing their political message: paid circulators. *See id.* at 424 ("Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication.").

Following *Meyer*, the Supreme Court later struck down laws that required petition circulators to be registered voters, to wear ID badges, and to have their names and payments reported because they were "restrictions . . . [that] significantly inhibit[ed] *communication with voters* about proposed political change." *Buckley*, 525 U.S. at 192 (emphasis added). But, to my knowledge, the Court has not applied strict scrutiny to laws that set the requirements for a direct democracy initiative to succeed.

So that's it. Strict scrutiny can apply when laws burden citizens' chosen means of speaking about the initiative they champion—such as by limiting who may act as a ballot circulator or by enacting laws directly discouraging circulators by regulating their conduct. Although the Court didn't use these terms, think of these cases as run-of-the-mill content-based speech cases, which of course receive heightened scrutiny. The laws in *Meyer* and *Buckley* all burdened speech aimed at promoting political change through a ballot initiative or referendum. Based on the content of their proponents' speech, Colorado created heightened burdens. Indeed, in some respects, we can view these laws as viewpoint discrimination. Under Colorado's law, *opponents* of the ballot initiative could pay people to lobby against its inclusion on the ballot. But *proponents* of the initiative were restricted on who they could use to assist with petitions. The same one-sided burdens appear in *Buckley*.

In contrast, the rules that structure the petitioning process itself—minimum signatures, deadline, and the like—had nothing to do with these cases. Speech is on one side of this constitutional line and procedure is on the other. *See also Initiative & Referendum Inst.*, 450 F.3d at 1099–100 ("The distinction is between laws that regulate or restrict the

communicative conduct of persons advocating a position in a referendum, which warrant strict scrutiny, and laws that determine the process by which legislation is enacted, which do not.").

## B.

From this straightforward precedent, the Ninth Circuit has adopted an extreme outlier position.  While the First Amendment protects individuals' advocacy of ballot initiatives or recalls, under our *Angle* precedent, we apply strict scrutiny to any rule that "significantly reduces the chances that proponents will be able to gather enough signatures to place initiatives on the ballot."  673 F.3d at 1134.   Our court seemingly believes that the First Amendment somehow guarantees the success of ballot petitions just because this would increase overall conversations about the topic.  All this, however, is from a misreading of a few lines from *Meyer*.

In *Angle*, our court reviewed a First Amendment challenge to Nevada's "All Districts Rule" for initiatives. 673 F.3d at 1127.  To qualify for placement on the ballot, the Rule required that proponents collect signatures equal to 10% of votes cast in the previous general election from each Nevada congressional district. *Id.* at 1126–27.  The plaintiffs contended that the Rule violated the First Amendment by increasing the burdens and expenses of qualifying an initiative for the ballot. *Id.* at 1127.

Citing *Meyer*, *Angle* first recognized that severe burdens on "core political speech" violated the First Amendment. *Id.* at 1132.  *Angle*, however, read *Meyer* to create "at least two ways" in which state ballot-initiative rules may severely burden political speech. *Id.*  First, *Angle* said that a severe burden may come from "regulations [that] restrict one-on-

one communication between petition circulators and voters." *Id.* (citing *Meyer*, 486 U.S. at 422–23). Second, *Angle* believed that "regulations can make it less likely that proponents will be able to garner the signatures necessary to place an initiative on the ballot, 'thus limiting their ability to make the matter the focus of statewide discussion.'" *Id.* (quoting *Meyer*, 486 U.S. at 423). In *Angle*'s view, both "ways" are *independent, standalone* tests and, if a regulation meets either test, strict scrutiny will apply. *Id.* at 1132–33.

*Angle* quickly dispensed with the first "way" to reach strict scrutiny. It concluded that Nevada's Rule did "not restrict one-on-one communications between petition circulators and voters." *Id.* at 1132. Because the Rule didn't limit the "number of voices" advocating for the initiative or discourage participation in circulating petitions by regulating circulators' conduct, the Rule didn't implicate this type of "severe burden." *Id.* at 1133 (simplified).

*Angle* then spent some time considering the second "way" to reach strict scrutiny—regulations that "limit[] the ability to make an initiative a matter of statewide discussion." *Id.* (simplified). It analyzed the issue this way:

> [Ballot initiative] regulations, however, may indirectly impact core political speech. As *Meyer* recognized, when an initiative fails to qualify for the ballot, it does not become "the focus of statewide discussion." *Meyer*, 486 U.S. at 423. Ballot access restrictions may therefore "reduc[e] the total quantum of speech on a public issue." *Id.* Thus, as applied to the initiative process, we assume that ballot access restrictions place a severe burden on core political speech, and trigger

> strict scrutiny, when they significantly inhibit the ability of initiative proponents to place initiatives on the ballot.
>
> This is similar to the standard we apply to ballot access restrictions regulating candidates. In that setting, we have held that "the burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' candidates can normally gain a place on the ballot, or whether they will rarely succeed in doing so."

*Id.* at 1133 (simplified). We then concluded that the plaintiffs' evidence was "too vague, conclusory and speculative" to show that the "All Districts Rule significantly reduces the chances that proponents will be able to gather enough signatures to place initiatives on the ballot." *Id.* at 1134. We then declined to apply strict scrutiny. *Id.*

Thus, *Angle* requires strict scrutiny for any state law that a federal court believes makes it *too hard* for proponents to get their initiatives on the ballot. Our court cemented the *Angle* framework in other cases. *See Chula Vista Citizens for Jobs and Fair Competition v. Norris*, 782 F.3d 520, 536 (9th Cir. 2015) (en banc) (holding that "strict scrutiny applies . . . where the challenged law *severely* burdens the ability to place an initiative on the ballot"); *Pierce*, 44 F.4th 853, 860 (assuming that "a restriction is a severe burden when it 'significantly inhibit[s] the ability of initiative proponents to place initiatives on the ballot'" (simplified)). And this case, *Committee to Recall*, though unpublished,

extends *Angle* to recall petitions.  *See* 2024 WL 1854286, at *2.

## C.

But here's the thing: *Angle*'s concern for the success of initiative petitions is misguided.  It misunderstands a single line in *Meyer*.  Further, *Angle*'s logic not only lacks a limiting principle—it's self-contradicting.  Finally, it violates the foundational principles of federalism and places the Ninth Circuit at odds with the majority of other circuits.

### 1.

Start with where *Angle* goes wrong in its reading of *Meyer*.  *Angle* fixates on *Meyer*'s reference to regulations that reduce the "total quantum of speech" and builds an independent test triggering strict scrutiny anytime a rule makes an initiative fail to become the "focus of statewide discussion."  673 F.3d at 1133 (simplified).  But from beginning to end, *Meyer* was concerned with Colorado's regulation of "direct one-on-one communication" between circulators and potential signatories.  *Meyer*, 486 U.S. at 424.  To be sure, *Meyer* observed how the consequence of Colorado's rule *also* reduced the "total quantum of speech"—only to add color to the *ways* core political speech was restricted in that case.  It didn't recognize an independent First Amendment protection against state rules that somehow diminish the "total quantum of speech."  So *Angle* has taken one of *Meyer*'s multiple *considerations*, which only mattered in the context of the restriction of one-on-one communication, and elevated it into a *standalone test*, independently sufficient to trigger strict scrutiny regardless of context.

The Supreme Court has not placed independent weight on *Meyer*'s "total quantum of speech" rationale. *Meyer* was concerned with restrictions on direct communication—not rules that indirectly made it harder to get an initiative on the ballot. *See* 486 U.S. at 424. And *Buckley* was mainly concerned about a regulation that "decreases the pool of potential circulators," which would limit the "number of voices who will convey [the initiative proponents'] message" and cut down the proponents' audience size. 525 U.S. at 195. Only as an afterthought did the Court mention that restricting circulators would *also* "limit[] proponents' 'ability to make the matter the focus of statewide discussion.'" *Id.* (simplified). Indeed, no Supreme Court majority has ever repeated the "total quantum of speech" phrase.

The "total quantum of speech" rationale also has no limits. If any government regulation that impacts the "total quantum of speech" gets First Amendment protection, all sorts of government activity would be subject to strict scrutiny. Would there be a First Amendment right to speed just because it would allow people to get to their destinations faster to talk to others more? *See also Schmitt v. LaRose*, 933 F.3d 628, 649 n.3 (6th Cir. 2019) (Bush, J., concurring in part) ("The Ninth Circuit's logic [in *Angle*] also is troubling because . . . it would call into question all subject matter restrictions on what Congress or state legislatures may legislate about because such restrictions make it harder for those subjects to become the focus of national or statewide discussion." (simplified)).

And as a matter of common sense, *Angle* is wrong. The logic of *Angle* is that too high of a bar in the petitioning process reduces overall speech statewide. But that's not necessarily true. Suppose a State sets an unusually high

signature requirement—75% of qualified voters need to sign a petition to qualify its proposed initiative for the ballot, and the voters must be distributed across all counties in the State. Now apply *Angle*. This hypothetical regulation would likely get strict scrutiny because it demands that proponents have *too many* conversations with other citizens. So *Angle* would apply strict scrutiny to regulations precisely because they push proponents to engage in *more dialogue* during the petitioning process. The same goes for time limits for gathering signatures. With shorter timeframes, proponents will likely have to recruit *more circulators* to succeed. So it may lead to more advocates rather than fewer. True, the *Angle* rule would encourage more speech after an issue gets on the ballot. But the First Amendment doesn't arbitrarily privilege post-ballot qualification speech over pre-qualification speech.

Thus, *Angle* elevates one of several considerations in *Meyer* to a standalone test. Beyond a close reading of the Supreme Court's opinions, it provides no limiting principle for what could become subject to First Amendment protection. And its test diverges from its purported concern for the "total quantum of speech" in society.

**2.**

*Angle* endangers federalism too. The Constitution established a system of "dual sovereignty" in which power to govern the people is divided between the federal and state governments. *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). The idea is that a "healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.* at 458. Unsurprisingly, then, "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of

the initiative process, as they have with respect to election processes generally." *Buckley*, 525 U.S. at 191.

But *Angle* wrests this determination from the States' political branches and submits it to federal courts instead. Federal courts now blow past States' policy balancing to ask and answer a standardless question: is it too hard to put an issue to a vote? This federal inquiry threatens a wide array of state procedures—not just direct democracy initiatives—that reflect States' considered policy judgments. Indeed, *Angle*'s "total quantum of speech" approach implicates every state rule that makes a given political objective less likely to succeed just because it might discourage its proponents from speaking. *See Initiative & Referendum Inst.*, 450 F.3d at 1100 (observing the danger this logic poses to supermajority requirements in the legislature and collecting state laws).

The federalism problem isn't just academic. Following this court's reasoning in *Angle* and its progeny, district courts have felt compelled to upset fundamental norms of state election procedure. They've done so by applying strict scrutiny to invalidate ballot rules even when no direct, one-on-one communication is subject to regulation. Rather, the aim in these cases is simply to give proponents a better shot at qualifying their initiatives for the ballot. That's a prime example of *Angle*'s toll on federalism.

Take *Reclaim Idaho v. Little*. There, a volunteer political action committee, Reclaim Idaho, wanted to put an education-funding initiative on Idaho's November 2020 general election ballot. 469 F. Supp. 3d at 993–94. Under Idaho's statutory scheme, Reclaim Idaho had up to 18 months to collect 55,057 signatures to get its initiative on the ballot. *Id.* at 993. Critically, Idaho law also required that a

circulator personally witness each signature he collected. *Id.* That meant all signatures had to be obtained in person. *Id.*

Reclaim Idaho's signature collection began to flag with the onset of COVID-19 public health restrictions. So it emailed the Idaho Governor's Office and the Idaho Secretary of State to ask if accommodations could be made. *Id.* at 995–96. The Governor's Office replied that it had no intention of taking executive action on the topic. *Id.* The Secretary of State answered that it could not override the statutory requirements put in place by the Idaho legislature. *Id.* at 996.

Without an updated statute from Idaho's legislature, that should have been the end of things. But it wasn't. Reclaim Idaho sued the Governor and Secretary of State in federal court, alleging a violation of its First Amendment rights under *Angle*. The district court enjoined Idaho's laws. It found that "the State's refusal to make reasonable accommodations . . . made it less likely for Reclaim Idaho to get enough signatures to place [its] initiative on the November 2020 ballot." *Id.* at 999. Because the Idaho executive's decision to "strictly enforce" Idaho law "reduced the total quantum of speech on the public issue of education funding," the district court held that Reclaim Idaho was likely to succeed on the merits of its *Angle* claim. *Id.* at 1000–01 (simplified).

Though the district court was "disinclined to tell the State how to run the initiative process," it gave Idaho the choice between accepting as sufficient the 30,000 signatures Reclaim Idaho had collected or giving Reclaim Idaho 48 more days to gather signatures while suspending the in-person signature requirement. *Id.* at 999, 1002. So in the

end, the Idaho political branches had spoken on an issue of Idaho law—whether ballot procedures should be relaxed based on the State's own COVID-19 response. But applying *Angle*, a federal district court second-guessed them to rewrite Idaho's rules.

In short, *Angle* forces district courts to override state election laws and grant political wins to litigious ballot proponents. The danger *Angle* poses to federalism isn't hypothetical. It's all too real.

### 3.

There's one last reason we should have reheard this case en banc: *Angle* puts us at odds with the majority of other circuits that have considered this question. The Seventh Circuit has treated this issue as a straightforward one— applying rational basis analysis when restrictions do not discriminate by content or viewpoint. *See Jones*, 892 F.3d at 938. The Tenth Circuit has hammered the distinction between laws that directly restrict communication and those that simply determine the process by which legislation is enacted—holding that only the former can be subject to strict scrutiny. *See Initiative & Referendum Inst.*, 450 F.3d at 1099–100 ("[T]here is a crucial difference between a law that has the 'inevitable effect' of reducing speech because it restricts or regulates speech, and a law that has the 'inevitable effect' of reducing speech because it makes particular speech less likely to succeed.").

Still more circuits have joined the chorus. *See Dobrovolny*, 126 F.3d at 1112–13 ("[T]he difficulty of the process alone is insufficient to implicate the First Amendment, as long as the communication of ideas associated with the circulation of petitions is not affected."); *Marijuana Pol'y Project*, 304 F.3d at 85 (finding no support

for the proposition that "limits on legislative authority—as opposed to limits on legislative advocacy—violate the First Amendment"); *Molinari v. Bloomberg*, 564 F.3d 586, 600 (2d Cir. 2009) (quoting *Initiative & Referendum Inst.*, 450 F.3d at 1100). These circuits all recognize the crucial distinction between free speech and effective persuasion. *See also Smith v. Ark. State Highway Emps.*, *Loc. 1315*, 441 U.S. 463, 464–65 (1979) (per curiam) ("The First Amendment . . . provides no guarantee that a speech will persuade or that advocacy will be effective." (simplified)). It's a pity we don't, too.

## IV.

## Conclusion

*Angle* misunderstands Supreme Court precedent. It reads *Meyer*'s concern for one-on-one communication to stand for the principle that federal courts may rewrite state laws—granting political windfalls to ballot proponents along the way—to maximize the "total quantum of speech" in society. This principle is as limitless as it is hard to understand. Untethered from precedent and history, it's time for *Angle* to be set adrift. It tells States interested in giving their citizens a more direct say in the political process that if they're in for a penny, they'll soon be in for a pound. One must wonder if this one-way ratchet will deter the very political innovations that *Angle* purports to protect.

For these reasons, I respectfully dissent from the denial of rehearing en banc.